447 S.E.2d 606

**WEST VIRGINIA ADVOCATES, INC.,
Plaintiff Below, Appellant,**

v.

**APPALACHIAN COMMUNITY HEALTH
CENTER, INC., Richard H. Kiley and
A.K., in her Capacity as Guardian for
J.K., Defendants Below, Appellees.**

No. 22027.

Supreme Court of Appeals of
West Virginia.

Submitted May 11, 1994.

Decided July 20, 1994.

Mike Kelly, Charleston, for appellant.

Harry A. Smith, Elkins, for appellee Appalachian Community Health Center, Inc.

R. Mike Mullens, Elkins, for appellee A.K.

WORKMAN, Justice:

This case is before the Court upon the appeal of the West Virginia Advocates, Inc. (hereinafter referred to as "WVA" or the "protection and advocacy system") from the May 28, 1993, order of the Circuit Court of Randolph County in which the lower court held that the Appellee, Appalachian Community Health Center, Inc. (hereinafter referred to as "ACHC") [1] was not legally obligated to afford the Appellant access to its client's, J.K.'s, [2] records absent the consent of A.K., J.K.'s mother and legal committee. The Appellant's only assignment of error is that the circuit court erred in refusing to afford it

---

**1.** According to the record, ACHC is the former Appalachian Mental Health Center, which is the entity named in the original complaint. The circuit court ordered that all pleadings be amended to reflect the center's current name of ACHC.

**2.** Consistent with our practice in cases involving sensitive matters, we use only initials to identify WVA's client and the client's mother. *See State v. Edward Charles L.*, 183 W.Va. 641, 645, 398 S.E.2d 123, 127 n. 1 (1990); *Benjamin R. v. Orkin Exterminating Co., Inc.*, 182 W.Va. 615, 390 S.E.2d 814 n. 1 (1990).

access to J.K.'s records, absent the consent of his committee. Based on a review of the parties' briefs and arguments, the record and all other matters submitted before this Court, we conclude that the circuit court erred and accordingly, we reverse and remand for further development of the record consistent with this opinion.

## I.

J.K. is an adult male who is developmentally disabled and also suffers from a mental illness.[3] As a result of his disability, J.K. participates in a wide range of services offered by the ACHC which include: outpatient services, adult training center, supported employment, vocational rehabilitation and Special Olympics.[4] Also due to J.K.'s disability, by order of the Randolph County Commission entered April 6, 1990, A.K., J.K's mother, was appointed as the Committee for J.K.[5]

According to the April 6, 1993, affidavit of Eileen Good, the WVA attorney who is seeking J.K.'s records from the ACHC, on February 21, 1992, J.K. asked for Ms. Good's assistance in resolving several family problems.[6] J.K. also indicated to Ms. Good that he wanted a new case manager assigned to him at the ACHC. Pursuant to J.K.'s request for assistance, he signed a written authorization on February 28, 1992, allowing the WVA to obtain his records, which were held by ACHC.[7]

Also on February 28, 1992, Ms. Good wrote a letter to Richard H. Kiley, the Executive Director of ACHC, relaying J.K.'s request for a new case manager. Mr. Kiley responded to Ms. Good's request by letter dated March 6, 1992, inviting Ms. Good to J.K.'s next treatment planning meeting where a new case manager would be discussed. Ms. Good attended that meeting, which occurred in April of 1992, and indicated in her affidavit that she became aware of continuing friction between J.K. and A.K. during this meeting. Ms. Good also stated that she was made aware that A.K. did not want Ms. Good to assist J.K. in his desire to obtain more independence. The Treatment Plan, which was completed as a result of the April meeting, indicated that Ms. Good was to be a part of finding "acceptable solutions" to J.K.'s problems.

It was not until June 1992, that Ms. Good asked to review ACHC's records pursuant to the authorization signed by J.K. Subsequent to this request, Ms. Good was informed by J.K.'s case manager, and by Mr. Kiley, that she could not have access to J.K.'s records

---

**3.** According to J.K.'s Annual Individual Treatment Plan (hereinafter referred to as "AITP"), prepared by the ACHC and dated January 13, 1992, J.K. is mildly mentally retarded and suffers from an adjustment disorder with a depressed mood. It was also noted that he was under a moderate level of stress.

**4.** J.K's participation in services offered by the ACHC was discussed in an April 8, 1992, document entitled "Treatment Planning Case Notes and Quarterly Summary" (hereinafter referred to as "Treatment Plan"), prepared by Susan Anderson, a case manager with the ACHC.

**5.** The April 6, 1990, order of the Randolph County Commission specifically found:
    1. That the said ... [J.K.] is a 32–year–old white male who is mentally retarded as defined in *West Virginia Code* [§] 27–1–3.
    2. That the said ... [J.K.] does not have the mental capacity nor the potential to care for his nutritional needs, his hygiene, or his financial affairs.
    3. That the said ... [J.K.] is incompetent as defined in *West Virginia Code* [§] 27–11–1, in that he is unable to manage his business affairs

or care for his personal well-being, and the appointment for [sic] a Committee for the said ... [J.K.] would therefore be appropriate.

**6.** According to Ms. Good's affidavit, she had previously participated in J.K.'s AITP, at which time A.K. was present and J.K.'s family problems were discussed. According to J.K.'s Treatment Plan, the family problems J.K. was having with A.K. involved the number of cigarettes J.K. was to smoke daily and the number of times J.K. could have visits with a woman friend.

**7.** The authorization signed by J.K. is a form document entitled "AUTHORIZATION TO REPRESENT/AUTHORIZATION TO RECEIVE AND TO RELEASE MEDICAL RECORDS." Pursuant to this authorization, J.K. permitted the WVA to represent him with regards to "obtaining appropriate mental health treatment and services[,]" and "obtaining appropriate developmental disability training and services[.]" The document also contains a provision that "[i]n connection with this representation I authorize all persons with records on J[.][.] K[.] to release all such records to West Virginia Advocates."

without A.K.'s consent and that A.K. would not give such consent.

## II.

The only issue raised is whether the Appellant should have access to the records of its client, J.K., which are in the custody of the ACHC, absent the consent of A.K., J.K.'s committee. The Appellant argues that the Developmental Disabilities Assistance and Bill of Rights Act (hereinafter referred to as the "DDA"), 42 U.S.C. §§ 6000 to 6083 (Supp.1994), specifically mandates the release of records to a designated protection and advocacy system upon the authorization of a client. *See* 42 U.S.C. § 6042(a)(2)(G)(i). The Appellant also argues that state law pertaining to the legal guardianship or committee [8] appointed to oversee J.K.'s affairs, as articulated by the lower court in its May 28, 1993, order is preempted under the supremacy clause of the United States Constitution [9] to the extent that state law violates the provisions of the DDA. *See* 42 U.S.C. § 6042(a)(2)(G)(i) and (f). In contrast, the Appellees argue that the DDA does not mandate the release of medical records without the consent of a legally-appointed guardian or committee. The Appellees further maintain that the pertinent provisions of the DDA do not preempt state law.

■ With the enactment of the DDA, Congress sought not only to recognize that persons with severe developmental disabilities "have capabilities, *competencies,* and personal needs and preferences[,]" but also that "it is in the national interest to offer persons with developmental disabilities *the opportunity, to the maximum extent feasible, to make decisions for themselves* and to live in typical homes and communities where they can exercise their full rights and responsibilities as citizens." 42 U.S.C. § 6000(a)(3) &

(9) (emphasis added). An additional purpose for enacting the DDA was "to provide assistance to States and public and private nonprofit agencies and organizations to assure that all persons with developmental disabilities receive the services and other assistance and opportunities necessary to enable such persons to achieve their maximum potential through increased independence, productivity, and integration into the community[.]" 42 U.S.C. § 6000(b)(1); *see also* 42 U.S.C. § 6000(b)(4). Congress indicated that one of the reasons for allowing the disabled a voice in their assistance and treatment was that "generic service agencies and agencies providing specialized services to persons with disabilities sometimes overlook, inappropriately address the needs of, or exclude persons with developmental disabilities in their planning and delivery of services[.]" 42 U.S.C. § 6000(a)(6).

■ Whether the Appellant is entitled to J.K.'s records specifically depends upon 42 U.S.C. § 6042 of the DDA. That statute explicitly conditions the receipt of federal DDA funds on the existence of a protection and advocacy system for developmental disabled individuals in each state, with the granting to such systems certain specific authorities as follows:

> In order for a State to receive an allotment under subchapter II of this chapter—
>
> (1) the State must have in effect a system to protect and advocate the rights of persons with developmental disabilities;
>
> (2) such system must—
>
> . . . .
>
> (G) have access to all records of—
>
> (i) *any person with developmental disabilities who is a client of the system if such person, or the legal guardian,* conservator, or other legal representa-

---

**8.** At the time of the appointment of A.K.'s committee, West Virginia Code § 27–11–1 (1992) governed. That statute provides that "[t]he county commission of a person's residence may appoint a committee for a person found to be incompetent." W.Va.Code § 27–11–1(a). The statute also sets forth the guidelines to be utilized by the county commission in making a determination of whether a committee or guardian should be appointed. *See* W.Va.Code § 27–11–1.

West Virginia Code § 27–11–1 has recently been repealed. *See infra* note 12.

**9.** *See* U.S. Const. art. VI, cl. 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.")

tive of such person, *has authorized the system to have such access;*

(ii) any person with developmental disabilities—

(I) who, by reason of the mental or physical condition of such person, is unable to authorize the system to have such access;

(II) who does not have a legal guardian, conservator, or other legal representative, or for whom the legal guardian is the State; and

(III) with respect to whom a complaint has been received by the system or with respect to whom as a result of monitoring or other activities there is probable cause to believe that such person has been subject to abuse or neglect; and

(iii) any person with a developmental disability who has a legal guardian, conservator, or other legal representative with respect to whom a complaint has been received by the system or with respect to whom there is probable cause to believe the health or safety of the individual is in serious and immediate jeopardy whenever—

(I) such representatives have been contacted by such system upon receipt of the name and address of such representatives;

(II) such system has offered assistance to such representatives to resolve the situation; and

(III) such representatives have failed or refused to act on behalf of the person[.]

42 U.S.C. § 6042(a)(1) and (a)(2)(G)[10] (emphasis added); *see generally* W.Va.Dep't of Health and Human Resources Policy No. 8130 §§ 10.12 and 10.12.5.1 (referring to language of the Protection and Advocacy for Mentally Ill Individuals Act of 1986 which is consistent with 42 U.S.C. § 6042(a)(2)(G)(i)).

It is clear that the states which accept federal funding under the 42 U.S.C. § 6042 must abide by the requirements of the statute. This is evident from a decision of the United States District Court for the Northern District of Ohio which held that "on the basis of both the plain language of the statute, and the legislative history behind 42 U.S.C. § 6042, that the protection and advocacy system requirement is clearly mandatory upon any state accepting funds under the Disabled Assistance Act." *Nicoletti v. Brown,* 740 F.Supp. 1268, 1274 (N.D.Ohio 1987); *see* 45 C.F.R. § 1386.30(b) & (d)(1) (providing that "[t]he State will comply with all applicable Federal statutes and regulations in effect during the time that the State is receiving formula grant funding[,]" or state could lose federal funding); *see also Mississippi Protection and Advocacy Sys., Inc. v. Cotten,* 929 F.2d 1054, 1058–59 (5th Cir.1991) (holding that the DDA required not only a system of protection and advocacy, but that the system be "an 'effective' system of advocacy"). It is undisputed that in a letter dated May 1, 1991, from Governor Gaston Caperton to the United States Department of Health and Human Services, the State of West Virginia made an assurance to the federal government that it will comply with the requirements of the DDA which necessarily includes 42 U.S.C. § 6042.[11] It is also undisputed that the WVA is the state designated protection and advocacy system authorized and required by the DDA.

We now turn to the operative portion of 42 U.S.C. § 6042 which permits the state designated protection and advocacy system to have access to all records of "any person with developmental disabilities who is a client of the system if such person, or the legal guardian, conservator, or other legal representative of such person, has authorized the system to have such access." 42 U.S.C.

---

**10.** The Appellant concedes that only subparagraph (G)(i) of 42 U.S.C. § 6042(a)(2) applies to the present case, since neither of the other two subparagraphs pertain to persons who are already clients of the system and with whom an advocate/client relationship has been established.

**11.** Specifically, the State made the following assurance to the federal government: "Assurance is hereby given that the State will recognize the priority of the Federal requirement for access to records of persons with developmental disabilities by the Protection and Advocacy System over State laws prohibiting such access."

§ 6042(a)(2)(G)(i). The statutory provision clearly indicates that a person who is a client of the system *or* a legal guardian of a developmentally disabled individual can give authorization to review the developmentally disabled individual's records. Further, the wording of the statute appears to place each individual authorized to give the system permission to access records on equal footing; hence, a disabled person has just as much authority to permit the system to have access to his records as the legal guardian. Moreover, there is no statutory requirement that if a disabled individual has a legal guardian or conservator, that the system must first obtain the consent of said guardian or conservator prior to accessing the requested records or that the system must obtain the guardian's or conservator's consent in addition to the disabled person's consent prior to accessing the records. *See* 42 U.S.C. § 6042(a)(2)(G)(i).

However, the statute leaves unaddressed the situation currently pending before this Court, that is, how to assess whether the developmentally disabled individual who has been appointed a legal guardian based upon his lack of mental capacity to care for his business affairs or personal well-being has sufficient ability to understand the meaning of his action in granting the system authority to access his records. Even the Appellant acknowledges that the individual's authority to give the system permission to access the individual's records is contingent upon the individual's ability to understand his action, as reflected in the following statement extracted from the Appellant's brief: "A choice specifically granted by the DDA to developmentally disabled clients *who have the ability to understand the meaning of their action* is whether to authorize an advocate to review their records as a preliminary step to advocating their viewpoint." (Emphasis added).

■ Relying on the fact that J.K. had been determined to be legally incompetent in a proceeding before the county commission,[12] the circuit court never addressed the issue of whether J.K. had the ability to understand his action in giving the Appellant his written authorization to access his records at the time he signed the written release. The circuit court, in basing its decision on the county commission's prior determination of legal incompetency, completely overlooked the strong intent expressed by Congress in drafting the DDA which indicates that severely developmentally disabled individuals "have capabilities, competencies, and personal needs and preferences," as well as a right to "achieve their maximum potential through increased independence...." 42 U.S.C. §§ 6000(a)(3) and (b)(1). Further, to the maximum extent feasible, the disabled individual should be afforded the opportunity to make his own decisions. 42 U.S.C. § 6000(a)(9). The circuit court also failed to abide by 42 U.S.C. § 6042(f) which provides that

[i]f the laws of a State prohibit a system from obtaining access to records of persons with developmental disabilities the provisions of subparagraph (A) of paragraph (2) of subsection (a) of this section shall not apply to such system before—

(1) the date such system is no longer subject to such prohibition; or

(2) the expiration of the 1–year period beginning on October 31, 1990, whichever occurs first.

The implication of this statutory provision is that it evinces a congressional intent that access to records of developmentally disabled individuals pursuant to 42 U.S.C. § 6042(a)(2)(G)(i) be governed by federal law.

---

12. This Court has recently held that "[b]ecause a finding of incompetency involves deprivation of an individual's exercise of liberty and property rights, a determination of incompetency under West Virginia Code § 27–11–1 (1992) cannot be summarily made; such finding must be reached through clear and convincing evidence." Syl. Pt. 1, *State ex rel. Shamblin v. Collier*, 191 W.Va. 349, 445 S.E.2d 736 (1994). Although the Appellant did not make the scope of the committee's authority an issue below, they seem to bring it up in the appeal by suggesting the order was too broad. While the determination of incompetency by the county commission and the scope of their order is not currently before us, the Appellant may seek to challenge that determination by the county commission based not only on the *Collier* decision, but also on the passage by the legislature of the West Virginia Guardianship and Conservatorship Act, which went into effect on June 10, 1994. *See* chapter 44A of the West Virginia Code.

*See* U.S. Const. art. VI, cl. 2; *English v. General Elec. Co.*, 496 U.S. 72, 78, 110 S.Ct. 2270, 2275, 110 L.Ed.2d 65 (1990) ("Congress can define explicitly the extent to which its enactments pre-empt state law").

Given the legislative intent surrounding the DDA, the clear statutory language of 42 U.S.C. § 6042(a)(2)(G)(i) enabling a developmentally disabled individual to authorize the system to have access to his records, as well as the inclusion of subsection (f) in 42 U.S.C. § 6042, whereby Congress mandated that access to records under said statute be governed by federal law, the lower court erroneously predicated its decision to deny the Appellant access to J.K.'s records on the existence of an order by the county commission appointing a legal guardian for J.K. Simply stated, an order of a county commission finding that an individual is legally incompetent, by itself, is insufficient to preclude the state designated protection and advocacy system from accessing a developmentally disabled individual's records pursuant to 42 U.S.C. § 6042(a)(2)(G) of the DDA. Additionally, we hold that under 42 U.S.C. § 6042(a)(2)(G)(i), a developmentally disabled individual may authorize the state designated protection and advocacy system to act on his behalf if the circuit court determines that said individual is mentally capable of granting such authorization. The circuit court should base its determination on such factors as the developmentally disabled individual's capability to understand the implication of granting such authority to the system, the individual's ability to express preferences and personal needs, as well as the individual's competency. If the circuit court determines that the individual is mentally capable of granting authorization to the protection and advocacy system, then the system can access said records on behalf of the individual.

In the present case, since the record was never developed regarding J.K.'s mental capacity to give the Appellant the authority to access his records, we remand this proceeding for a development of the facts relating to that issue. Once the record is factually developed, the circuit court can then determine whether J.K. has the mental capacity to authorize the Appellant to access his records under the DDA. We caution, however, that if it is determined that J.K. can authorize the Appellant to have access to his records under the DDA, this ruling of itself in no other way negates or diminishes A.K.'s legal guardian status over J.K. Further, A.K. should not only continue to be consulted on issues relating to J.K., but should also continue to have input on the matters concerning her son. This is one of those extremely difficult human cases where this young man's mother and the WVA want what is best for him, and there is a strong suggestion that, despite his limitations, J.K. also has strong feelings and wishes as to his best interests, and it is hoped that all of these can work together to help and understand J.K., and to the extent possible, respect his wishes for his own life.

Based on the foregoing, the decision of the Circuit Court of Randolph County is hereby reversed and remanded for further proceedings consistent with this opinion.

Reversed and remanded.