DISABILITY LAW CENTER,
INC., Plaintiff

v.

Emma RIEL, as guardian of Loretta Riel, and Gerald J. Morrissey, in his official capacity as Commissioner of the Department of Mental Retardation, Defendants

No. CIV. A. 00–10789–PBS.

United States District Court,
D. Massachusetts.

Feb. 5, 2001.

Romeo G. Camba, Assistant Attorney General, Boston, MA, Matthew Engel, Northampton, MA, for Plaintiffs.

Romeo G. Camba, Assistant Attorney General, Boston, MA, for Defendants.

### MEMORANDUM AND ORDER

SARIS, District Judge.

### I. INTRODUCTION

Plaintiff Disability Law Center ("DLC") brings this action seeking injunctive and declaratory relief pursuant to 42 U.S.C. § 1983 and the Developmental Disabilities Assistance and Bill of Rights Act ("the Act"), 42 U.S.C. § 6000 et seq.,[1] to compel the guardian of an adult mentally retarded woman, Loretta Riel, and the Commissioner of the Massachusetts Department of Mental Retardation ("DMR") to provide

---

1. After the hearing, 42 U.S.C. § 6000 et seq. was amended by the Developmental Disabilities Assistance and Bill of Rights Act of 2000, Pub.L. No. 106–402, 114 Stat. 1677, 1714, § 143(a)(1). Although the numbering and format of many of the statute's provisions have changed, the substance of the relevant amended statutory sections does not appear to differ in significant ways. I will continue to cite to the U.S.Code sections cited in the briefs and the case law.

access to Ms. Riel's records. As the Protection and Advocacy system ("P & A") appointed by the state of Massachusetts pursuant to the Act "to protect and advocate the rights of individuals with developmental disabilities," 42 U.S.C. § 6042(a)(1), the DLC claims that it needs these records to investigate an incident of alleged abuse, but that the guardian has not consented to access. The Commissioner has moved for summary judgment on the ground that the guardian has the right to refuse access pursuant to § 6042(a)(2)(*I* )(iii). The plaintiff has cross-moved for summary judgment.[2]

After a hearing, Defendant Morrissey's Motion for Summary Judgment is **DENIED**, and Plaintiff's Motion for Summary Judgment is **ALLOWED**.

## II. BACKGROUND

Loretta Riel[3] is a fifty-year-old woman with mental retardation and other developmental disabilities, residing at the Glavin Regional Center, an Intermediate Care Facility for the Mentally Retarded operated by the Massachusetts Department of Mental Retardation. On the evening of December 31, 1998, staff at Glavin prevented Loretta from making a phone call to her family. Upset at being denied the phone call, Loretta sat down on the floor. Staff then put Loretta on a chair in the hallway. Loretta threw herself out of the chair and put her foot under a laundry cart. Staff then forcibly pulled Loretta away, causing her foot to be cut by the laundry cart, and dragged her from the hallway to her room on a blanket.

Believing that the actions of the staff constituted illegal restraint and abuse, the Glavin Human Rights Committee ("GHRC") filed an investigation complaint with the facility alleging illegal use of a restraint, mistreatment, and physical abuse, and requested reconsideration of the "Corrective Action Plan" portion of the report. When the reconsideration request was denied, the GHRC filed an appeal with the Commissioner of the Department of Mental Retardation. In March 1999, a second complaint was filed by the Human Rights Officer at Glavin. According to Steven R. Hennigan, GHRC chairperson, "[t]his second investigation substantiated that mistreatment and emotional abuse occurred in the use of a number of restraints and other interventions which were systematically used when Ms. Riel exhibited difficult behaviors." (Hennigan Aff. ¶ 7) Just as with the first investigation report, the GHRC believed that the Corrective Action Plan from the second investigation also would not adequately protect Loretta from the possibility of future mistreatment. The reconsideration request was again denied, and the GHRC appealed to the Commissioner of the Department of Mental Retardation for the second time.

On August 12, 1999, the Glavin Human Rights Officer contacted the Disability Law Center, which is the Massachusetts Protection and Advocacy system, seeking representation for Loretta regarding the Corrective Action Plan appeal and related matters. In turn, the DLC contacted Emma Riel, who is Loretta Riel's legal guardian and sister-in-law, once by telephone and three times by letter, explaining the DLC's role as the Massachusetts P & A system and requesting the guardian's permission to access Loretta's records for an investigation. The DLC never received a response to its letters and, at one point, on December 15, 1999, was informed by the Human Rights Officer at Glavin that the guardian was refusing to sign the Release of Information form that had been sent to her by the DLC.

---

2. The Court denies Plaintiff's Motion to Withdraw the Motion for Summary Judgment, because the affidavit of Steven R. Hennigan does not create disputed issues of material fact and because it is tardy.

3. With no disrespect meant to Ms. Loretta Riel or her guardian, Ms. Emma Riel, I will refer to each woman by her first name because the last names are the same.

Emma Riel is an attentive guardian. She visits with Loretta once a month and speaks with her by telephone between visits. Emma frequently contacts Glavin staff by telephone and inquires about Loretta's progress and care. Emma also attends Loretta's annual team meeting, reviews her behavior plans, and visits her workshop at Glavin. Emma asserts that after she discussed the December 1998 incident with members of the staff at Glavin and reviewed the investigation report and action plans concerning the incident, she was satisfied that the matter "was handled in the best way by staff considering Loretta's condition and behaviors." (E. Riel Aff. ¶ 5.) In addition, the guardian has concluded that "the investigation of the incident was adequately conducted and that Loretta's rights to be free from abuse and illegal restraint are not at risk.... Because [she] did not believe that further investigation was necessary and because [she] feel[s] that further investigation would be disturbing and harmful to Loretta, [Emma] chose not to sign the Release." (E. Riel Aff. ¶¶ 5, 6.) Furthermore, "[b]ased on what [she] believes to be in Loretta's best interests, [Emma has] no wish to take advantage of any services which the Disability Law Center may be offering arising from the December 31, 1998 incident and do[es] not consent to allowing the Disability Law Center access to Loretta's records." (E. Riel Aff. ¶ 7.)

## III. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Barbour v. Dynamics Research Corp.*, 63 F.3d 32, 36 (1st Cir.1995) (quoting Fed. R.Civ.P. 56(c)). To prevail on summary judgment, the moving party must show that there is an absence of evidence to support the non-moving party's position. *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir.1990); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party satisfies this requirement, the burden shifts to the non-moving party to establish the existence of at least one factual issue that is both genuine and material. *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 841 (1st Cir.1993); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To oppose summary judgment successfully, the non-moving party "may not rest upon mere allegation or denials of his pleading," but must set forth specific facts showing that there is a genuine issue for trial. *LeBlanc*, 6 F.3d at 841 (quoting *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505). If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *Rogers*, 902 F.2d at 143 (quoting *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505) (citations omitted). The Court must "view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Barbour*, 63 F.3d at 36.

### B. Statutory Scheme

The Act mandates that to receive federal funding, every state "must have in effect a system to protect and advocate the rights of individuals with developmental disabilities." § 6042(a)(1). These state-appointed Protection and Advocacy systems must "have the authority to—(i) pursue legal, administrative, and other appropriate remedies or approaches to ensure the protection of, and advocacy for, the rights of" individuals with developmental disabilities. 42 U.S.C. § 6042(a)(2)(A)(i). They also must have "the authority to investigate incidents of abuse and neglect of individuals with developmental disabilities if the incidents are reported to the system or if there is probable cause to believe that the incidents occurred." § 6042(a)(2)(B). The P & A system must "be independent of

any agency which provides treatment, services, or habilitation to individuals with developmental disabilities" and must "have access at reasonable times and locations to any resident" with a developmental disability in a facility. §§ 6042(a)(2)(G) and (H).

Of key significance to this suit, the P & A system must also: (*I*) have access to all records of

(i) any individual with developmental disabilities who is a client of the system if such individual, or the legal guardian, conservator, or other legal representative of such individual, has authorized the system to have such access;

(ii) any individual with development disabilities—

(I) who, by reason of such individual's mental or physical condition, is unable to authorize the system to have such access;

(II) who does not have a legal guardian, conservator, or other legal representative, or for whom the legal guardian is the State; and

(III) with respect to whom a complaint has been received by the system or with respect to whom as a result of monitoring or other activities there is probable cause to believe that such individual has been subject to abuse or neglect; and

(iii) any individual with a developmental disability who has a legal guardian, conservator, or other legal representative with respect to whom a complaint has been received by the system or with respect to whom there is probable cause to believe the health or safety of the individual is in serious and immediate jeopardy whenever—

(I) such representatives have been contacted by such system upon receipt of the name and address of such representatives;

(II) such system has offered assistance to such representatives to resolve the situation; and

(III) such representatives have failed or refused to act on behalf of the individual.

§ 6042(a)(2)(*I*)(*See also* Appendix A for Pub.L. No. 106–402, 114 Stat. 1677, 1715–16, § 143(a)(2)(*I*)(iii), the amended § 6042(a)(2)(*I*)(iii)). The term "records" is defined to include, among other things, "reports prepared by an agency or staff person charged with investigating reports of incidents of abuse or neglect, injury or death" that describe the incidents and the steps taken to investigate the incidents. 42 U.S.C. § 6042(f).

## C. The Role of the Guardian

The crux of this dispute is the interpretation of § 6042(a)(2)(*I*)(iii), giving the P & A access to "all" records, when the P & A has received a complaint, or has probable cause, with respect to an individual with a legal guardian; the P & A has contacted the guardian and offered assistance;[4] and the guardian has "failed or refused to act on behalf of the individual." § 6042(a)(2)(*I*)(iii).

The Commissioner asserts that this provision bars him from disclosing the records of a resident of a mental health facility against the wishes of a legal guardian who has made an informed decision to decline the P & A system's offer of services and assistance. He further contends that the phrase "failed or refused to act on behalf of the individual" is intended to address only those situations where an individual's appointed guardian has neglected her obligation as a guardian and failed to act in good faith. The DLC responds that it has statutory authority to obtain access to Loretta Riel's records without her guardian's consent even when the guardian acts in good faith, because it cannot fulfill its stat-

---

**4.** The Commissioner initially took the position that the DLC did not make an offer of assistance but just requested that the guardian sign a release form. However, the parties agreed at the hearing that any offer of assistance would be futile, because the guardian has chosen not to pursue the matter.

utory mandate to investigate incidents of abuse and neglect, and to pursue appropriate legal remedies, without having access to the investigation reports and without reviewing the adequacy of the remedies provided.

The case law in this area is sparse. In *Alabama Disabilities Advocacy Program v. J.S. Tarwater Developmental Center*, 97 F.3d 492, 497 (11th Cir.1996), interpreting 42 U.S.C. § 6042(a)(2)(*I* )(ii), which governs residents who have no legal guardian, the Eleventh Circuit recognized that "the Act provides express authority for P & A's to gain broad access to records, facilities, and residents to ensure that the Act's mandates can be effectively pursued." *Id.* (citing *Mississippi Protection & Advocacy System, Inc. v. Cotten*, 929 F.2d 1054, 1058–59 (5th Cir.1991) ("The state cannot satisfy the requirements of [the Act] by establishing a protection and advocacy system which has this authority in theory, but then taking action which prevents the system from exercising that authority.")). Addressing the argument that the "families' unwillingness to release the records should be controlling," the court held, "Pursuant to § 6042, this contention is incorrect if [the residents] do not have a legal representative, including a legal guardian." *Id.* Although the Eleventh Circuit seemed to suggest *in dicta* that a guardian has a statutory role in determining the access of a P & A to a resident's records in certain circumstances, it did not interpret the "failed or refused to act" language in § 6042(a)(2)(*I* )(iii)(III). Furthermore, the court insightfully observed,

> Since children living in institutions necessarily live away from their parents, the most involved and concerned parents cannot observe the majority of events experienced by their children in institutions.... Regular telephone calls or visits will not uncover abuse or neglect. The opportunity to observe possible abuse or neglect is limited, particularly when institution staff offer plausible explanations for injuries.... [Parents']

faith in the institution does not alter the fact that abuse or neglect may have occurred. Congress legislated the Act to protect disabled people who are unable to protect themselves.

*Id.* at 498 n. 3.

Although no appellate court has interpreted § 6042(a)(2)(*I* )(iii)(III), two district courts have construed it broadly. One of these courts stated,

> It is evident from the structure of § 6042(a)(2)(I)(iii) that this section is designed to give P & A access to records where they have received a complaint and/or have probable cause regarding an individual, and the guardian has been contacted by the P & A and does not grant permission or refuses to act. The language of this section of the Act is clear, and it contemplates access to records when the [P & A] either receives a complaint regarding an individual resident, or has probable cause to believe that the health or safety of an individual is in serious and immediate jeopardy.

*Pennsylvania Protection & Advocacy, Inc. v. Royer–Greaves School for Blind*, 1999 WL 179797, at *8, *10 (E.D.Pa.1999) (holding further that "a guardian would not have the authority to deny access to the records of an individual for whom this section is satisfied, as this section is designed to give the P & A a right to access in the event a guardian is not responsive or cooperative."); *Michigan Protection & Advocacy Service, Inc. v. Miller*, 849 F.Supp. 1202, 1208 (W.D.Mich.1994) (holding that the Act does not require parental consent to access records and that the Act "clearly mandate[s] that [P & A organizations] have the authority to access ... records in specific cases where developmentally disabled and mentally ill individuals are involved."); cf. *West Virginia Advocates, Inc. v. Appalachian Community Health Center, Inc.*, 191 W.Va. 671, 676, 447 S.E.2d 606, 611 (1994) (holding that federal law preempts state law and that "a disabled person has just as much authority to permit the [P & A] system to have

access to his records as the legal guardian" under § 6042(a)(2)(G)(i)).

The Court's statutory construction of this difficult provision begins with the "oft-stated" canon that "[a]ll words and provisions of statutes are intended to have meaning and are to be given effect, and no construction should be adopted which would render statutory words or phrases meaningless, redundant or superfluous." *United States v. Holmquist,* 36 F.3d 154, 160 (1st Cir.1994) (quoting *United States v. Ven Fuel, Inc.,* 758 F.2d 741, 751–52 (1st Cir.1985)). "[A] statute must be read as a whole, with due regard for its object, purposes, and underlying policy." *Id.*

 Reading the statute as a whole, the Court is persuaded by the argument that where there is a complaint or probable cause, § 6042(a)(2)(I)(iii) gives the P & A the right to access those records necessary to "pursue legal, administrative and other appropriate remedies or approaches to ensure the protection of, and advocacy for" individuals with developmental disabilities and "to investigate incidents of abuse and neglect of individual with developmental disabilities" even where the guardian does not give her consent. §§ 6042(a)(2)(A)(i) & (a)(2)(B). These complementary statutory duties to investigate and pursue legal remedies are not contingent on a guardian's consent. Therefore, a construction of § 6042(a)(2)(I)(iii) permitting the guardian to block all access to records necessary to investigate an incident would effectively give the guardian veto power over the investigation itself, which would thwart the express statutory mandate of the P & A system.

The Commissioner argues that giving the P & A access to records regardless of the guardian's good faith objection would reduce to a useless formality the requirement that the P & A system contact the legal guardian and offer assistance. If the P & A is allowed access to the individual's records regardless of how the legal guardian responds, the Commissioner asks, why

not trigger the right to access simply upon the receipt of the complaint or the existence of probable cause? This is a fair argument, because at the same time that the Act envisions an effective role for the P & A, it also respects the role of the legal guardian and the family. The Act states, for example, that all programs, projects, and activities receiving financial assistance under the Act "shall be carried out in a manner consistent with the principles that—(3) individuals with developmental disabilities and their families are the primary decisionmakers regarding the services and supports such individuals and their families receive ...." § 6000(c)(3). Further, the Act requires that the P & A should consult, work with, and provide assistance to, the guardian. Thus, rather than being a hollow gesture, the consulting requirement serves the salutory and hortatory purpose of encouraging the P & A and guardian to cooperate, and requiring the P & A to provide assistance to the guardian if requested.

However, the Act does not recognize guardians as the *sole* decision-makers. In fact, the Senate report from the 1990 amendments to the Act, which first incorporated language permitting P & A access to all records where a guardian "fail[s] or refuse[s] to act," indicates that the Act was not intended to grant a guardian power to block a P & A's access to an individual's records. It reads:

> Another issue raised was with regard to the difficulty experienced by some systems in reaching clients for whom the system has reason to believe that abuse or neglect may be occurring and that the health and safety of the individual is in serious jeopardy. In cases where the individual has a guardian, existing law requires that the P & A System not become involved if the guardian refuses the assistance offered. Clarification of the conditions under which the P & A System can intervene in these extraordinary circumstances is necessary.

S.Rep. No. 101–376, at 12 (1990). The Senate Report also pointed out that under then-current law, the P & A system could gain access to records only for incompetent persons who did not have legal guardians. *Id.* at 23. It further explains:

Section 13 amends Section 142 and clarifies the conditions under which protection and advocacy systems have access to records in those extraordinary situations when there is reason to believe that the health or safety of an individual with developmental disabilities is in serious or immediate jeopardy and the legal guardian, conservator, or other legal representatives have been in contact, offered assistance, but have failed or refused to act on behalf of the person.

*Id.* at 33. Thus, the legislative history supports the statutory interpretation that Congress intended to let the P & A's obligations trump the guardian's wishes in the "extraordinary circumstances" outlined in the statute.[5]

The Commissioner argues that the guardian here did not fail or refuse to act, but instead proactively investigated the incident and decided in good faith not to pursue further action based on what she believed to be in her ward's best interests. Essentially, the Commissioner urges the Court to read a subjective good faith component into the statute: that is, if the guardian refuses in good faith to act, the P

& A is barred from access to the ward's records. At first blush, this deferential approach is tempting, because it is consistent with state law dealing with guardianship, which provides that "[t]he guardian is responsible for the general care and control of [her] ward." *Judge Rotenberg Educ. Center, Inc. v. Commissioner of the Dep't of Mental Retardation,* 424 Mass. 476, 478, 677 N.E.2d 156, 158 (1997) (citing Mass. Gen. Laws ch. 201, § 6A). It is because primary responsibility for a ward's well-being lies with the legal guardian that "[c]ourts are reluctant to appoint a next friend when there is a duly appointed representative." *Id.* at 479, 677 N.E.2d at 159. "A next friend is not required where there is a duly appointed guardian, unless it is clear that the interests of the guardian and the ward conflict." *Id.; accord Developmental Disabilities Advocacy Ctr., Inc. v. Melton,* 689 F.2d 281, 286 (1st Cir.1982) (construing Fed.R.Civ.P. 17(c) as permitting appointment of a next friend or guardian ad litem only when the general representative has a conflict of interest).

However, the problem with the Commissioner's statutory interpretation is that the rights of the P & A are governed by federal law, not state law, and Congress did not limit the words "failed or refused to act" with any modifier like "unreasonably," "in bad faith," or "in an abuse of trust." In light of the unambiguous mandate to the P & A to investigate incidents

---

**5.** In stark contrast, prior to the 1990 Amendments to the Act, a guardian's ability to block a P & A's access to records was unbridled, because the statutory provision regarding access to records contained no qualifying language allowing a P & A to access records in certain circumstances, despite a guardian's refusal to grant permission. The relevant provision stated that a P & A must:

(G) have access to all records of—
 (i) any person with developmental disabilities who is a client of the system if such person, or the legal guardian, conservator, or other legal representative of such person, has authorized the system to have such access; and
 (ii) any person with developmental disabilities—

(I) who, by reason of the mental or physical condition of such person, is unable to authorize the system to have such access;
(II) who does not have a legal guardian, conservator, or other legal representative, or for whom the legal guardian is the State; and
(III) with respect to whom a complaint has been received by the system or with respect to whom there is probable cause to believe that such person has been subject to abuse or neglect;

Pub.L. No. 100–146, 101 Stat. 840, ___, § 301(a)(2)(G)(amending 42 U.S.C. § 6042(a)(2)(G)). Thus, the language that now exists in § 6042(a)(2)(*I*)(iii)(III) of the Act, permitting a P & A to access records if a guardian fails or refuses to act, simply did not exist until the 1990 statutory amendments.

of abuse and pursue appropriate remedies, the Court concludes that the better interpretation of § 6042(a)(2)($I$)(iii) is that the P & A is entitled to obtain access to the records necessary for investigation so long as the other statutory prerequisites are met, regardless of the wishes of the guardian.

### IV. ORDER

For the foregoing reasons, Defendants' Motion for Summary Judgment (Docket No. 15) is hereby **DENIED**.[6] Plaintiff's Motion for Summary Judgment (Docket No. 13) is **ALLOWED**. The defendant is ordered to release the investigation records to the DLC forthwith.

---

**6.** The DLC seeks discovery. In light of this ruling, the request for discovery is denied. Indeed, the request to depose the guardian highlights one of the flaws in a statutory interpretation which sets a good faith or abuse of trust standard, because discovery pits the guardian against the P & A system, although both seek the best interests of the resident.