**IOWA PROTECTION AND ADVOCACY SERVICES, INC., Plaintiff,**

v.

**GERARD TREATMENT PROGRAMS, L.L.C., Defendant.**

**No. C 01–3013–MWB.**

United States District Court,
N.D. Iowa,
Central Division.

June 25, 2001.

**1152**

Sharon K. Malheiro, Davis, Brown, Koehn, Shors & Roberts, P.C., Des Moines, IA, for plaintiff.

C. Bradley Price, Rustin Davenport, DeVries, Price & Davenport, Mason City, IA, for defendant.

## MEMORANDUM OPINION AND ORDER REGARDING PLAINTIFF'S REQUEST FOR PRELIMINARY INJUNCTION

BENNETT, Chief J.

### TABLE OF CONTENTS

I. INTRODUCTION ...................................................1153
 A. Factual Background ..........................................1153
 B. Procedural Background ......................................1154

II. LEGAL ANALYSIS .............................................1156
 A. Standards For A Preliminary Injunction ...................1156
 B. Consideration Of The Relevant Factors ...................1157
 1. Likelihood of success on the merits ....................1157
 a. Rights of access under the DDA and the PAMII Act ..............1157
 i. Genesis of the P & A system ...........................1157
 ii. Authority of P & As ...................................1158
 iii. Rights of access .....................................1159
 b. Likelihood of success here ...............................1161
 i. The Riel decision ....................................1161
 ii. Effect of a guardian's denial of consent under the PAMII Act ...............................................1163
 iii. Other limitations ...................................1167
 2. Irreparable harm .......................................1172
 3. Balance of harms and public interest ...................1174
 C. Bond ......................................................1175

III. CONCLUSION .................................................1176

How much access to records, facilities, and patients of a psychiatric medical institution for children is a non-profit advocacy agency entitled to have in the course of its investigation of the death of one resident of the institution and its determination that there is probable cause to believe that other residents are in jeopardy of abuse or

neglect? That is the question animating the advocacy agency's present request for a preliminary injunction. The advocacy agency contends that the psychiatric institution has denied or interfered with its access to information essential to its investigation, in violation of the Protection and Advocacy for Mentally Ill Individuals Act of 1986, as amended in 1991 (PAMII Act), 42 U.S.C. § 10801 *et seq.*, and the "Protection and Advocacy of Individual Rights" provision of the Developmental Disabilities Act of 1984, as amended (DDA), 42 U.S.C. § 6042. The psychiatric institution, however, contends that it has cooperated with the advocacy agency's investigators, once their authority to conduct the investigation was ascertained, and that the advocacy agency is not entitled to unlimited access to its records, facilities, and patients, but only to "reasonable" access that will not interfere with operations of the facility, and that "reasonable access" to individuals and their records is limited to cases in which the advocacy agency has probable cause to believe that those specific individuals are in jeopardy. The court must determine whether a preliminary injunction is required to guarantee the advocacy agency the level of access to which it is entitled under the PAMII Act and the DDA. At oral arguments on the advocacy agency's request of a preliminary injunction, the critical issue before the court crystalized into the question of whether or not the advocacy agency has a right of access to records and patients even in cases in which the patients' guardians have told either the advocacy agency or the institution that they do not want the advocacy agency to have such access.

## I. INTRODUCTION

### A. Factual Background

Plaintiff Iowa Protection and Advocacy Services, Inc. (IPAS) alleges that it is an independent, non-profit agency created by federal law to serve individuals with disabilities. More specifically, IPAS alleges that it has a federal mandate to conduct investigations of abuse and neglect and potential abuse and neglect of disabled persons pursuant to 42 U.S.C. § 6042, 42 U.S.C. § 10801 *et seq.*, and state law. Defendant Gerard of Iowa, which contends that its proper name is Gerard Treatment Programs, L.L.C. (Gerard), is a psychiatric medical institution for children located in Mason City, Iowa.

On or about February 9, 2001, a juvenile resident of Gerard, Tanner J. Wilson, died of "cardiopulmonary arrest while being restrained." *See* Amended and Substituted Complaint And Request For Injunctive And Declaratory Relief, Exhibit B (medical examiner's report on "immediate and basic" cause of death). IPAS alleges that Mr. Wilson died while being restrained by employees of Gerard. IPAS alleges that it became aware of Mr. Wilson's death on February 12, 2001. Consequently, on February 14, 2001, investigators from IPAS arrived at Gerard to conduct an investigation into Mr. Wilson's death. However, the investigators were denied access at that time and again on February 15, 2001, for reasons that are disputed. IPAS filed its initial Complaint in this matter on February 16, 2001, after which the parties were able to negotiate some access to Gerard's facility and records concerning Mr. Wilson. IPAS alleges, however, that Gerard continued to interfere with its investigators' full access to all of Mr. Wilson's records.

During the course of its investigation of the death of Mr. Wilson, IPAS alleges that it received information that provided IPAS with probable cause to believe that "other residents" of Gerard's facility in Mason City may also be in jeopardy of being abused. *See* Amended And Substituted Complaint, ¶ 20. IPAS alleges that it noti-

fied Gerard's counsel in early March that its investigation had expanded beyond the death investigation into a "probable cause" investigation concerning potential abuse of other residents at the facility. In an Amended and Substituted Complaint, filed April 2, 2001, IPAS alleges that Gerard has interfered with that expanded investigation as well. Specifically, IPAS alleges, first, that access to records and residents has not been allowed. Second, IPAS alleges that, prior to being allowed to begin its investigation and before Gerard provided IPAS with a list of names, addresses, and telephone numbers of parents, guardians, and/or guardians ad litem of residents of the facility, Gerard contacted those persons and informed them of IPAS's investigation and the possibility that IPAS would seek interviews with those persons or the residents for whom they were responsible. Although IPAS contends that Gerard provided no such notice of the investigations by the Iowa Department of Investigations and Appeals, the Iowa Department of Human Services, and law enforcement departments, Gerard contends that it was specifically prohibited by those entities from providing any notice of investigations and possible interviews. Although IPAS's Amended Complaint does not make clear in what way Gerard's notice to parents, guardians, and/or guardians ad litem interfered with IPAS's investigation, IPAS alleges that its investigation has been irreparably harmed by Gerard's interference.

### B. Procedural Background

As noted above, IPAS filed its initial Complaint And Request For Expedited Relief on February 16, 2001, and an Amended and Substituted Complaint And Request For Injunctive And Declaratory Relief on April 2, 2001. In its Amended Complaint, IPAS alleges two causes of action. First, IPAS alleges that "[t]he policy and actions of the Defendant violates [sic] the right of Plaintiff to meaningful and timely access to the records of Mr. Wilson as well as to the other residents and records of the facility in violation of the Protection and Advocacy for Mentally Ill Individuals Act of 1991, 42 U.S.C. § 10801, et seq., and the policy and actions, unless enjoined will violate [IPAS's] right to that information in the event of future deaths and probable cause determinations." Amended And Substituted Complaint, ¶ 31. Second, IPAS alleges that "[t]he policy and actions of the Defendants [sic] in contacting the parents/guardians/guardians ad litem prior to providing the [IPAS] with the name, address and telephone numbers of the parents/guardians/guardians ad litem violates 42 U.S.C. § 10801, et seq., and unless enjoined will violate [IPAS's] rights in the event of future deaths and probable cause determinations." *Id.* at ¶ 32.

In its Amended Complaint, IPAS seeks declaratory and injunctive relief. Specifically, IPAS "requests that after notice and hearing, this Court enter a declaratory judgment that the Defendant's policies, regulations, practices and conduct of interfering with and denying the Plaintiff proper and immediate access violates [sic] 42 U.S.C. Section 6042 and 42 U.S.C. Section 10801, et seq." *Id.* at 35 (Declaratory Relief). Also, IPAS prays that the court do the following:

A. Enter a preliminary injunction enjoining Defendant, its agents or employees from denying [IPAS] full and immediate access to the records of all individuals receiving services at Gerard.

B. Enter a permanent injunction enjoining the Defendant, its agents or employees from denying [IPAS] full and immediate access to the records of all individuals receiving services at Gerard if a complaint is received and/or probable cause exists to believe that abuse or neglect has occurred.

C. Enter a permanent injunction enjoining Defendant, its agents or employees from denying [IPAS] full and immediate access to the name, address and telephone number of the parents/guardians/guardians ad litem of individuals who receive services at Gerard.

D. Enter a declaratory judgment that the Defendant's policies, regulations, practices and conduct of denying access violates 42 U.S.C. Section 6042 and 42 U.S.C. Section 10801.

F. [Sic] Award attorney fees and costs pursuant to 28 U.S.C. Section 2202; and

G. Award punitive damages against the Defendant.

H. Award such other relief that the Court deems equitable and just.

Amended And Substituted Complaint, Prayer. Thus, only subdivision A of IPAS's Prayer is presently at issue, as only that subdivision prays for *preliminary* injunctive relief. More specifically still, that subdivision only prays for preliminary injunctive relief on IPAS's first cause of action, which concerns access to records, patients, and facilities. No preliminary injunctive relief is sought on IPAS's second cause of action, which concerns Gerard's alleged notification of parents, guardians, and guardians ad litem of IPAS's investigation before Gerard provided IPAS with the names and addresses of such persons.

Gerard answered IPAS's initial Complaint on April 2, 2001, and IPAS's Amended And Substituted Complaint on April 13, 2001. Gerard contends, generally, that it has cooperated with IPAS's requests for access, once IPAS established its authority to conduct any investigation at all, and that IPAS is responsible for any delays in initiation or expansion of its investigation by failure to inform Gerard properly of its authority to, and interest in, conducting either its initial or expanded investigation. Gerard affirmatively alleges that it has made every effort to negotiate reasonable access by IPAS to the records, patients, staff, and facilities in question, but that IPAS has not explained how the unfettered access it seeks comports with applicable regulations. Gerard also asserts that it has an obligation to keep parents and guardians informed as to matters pertaining to the care of their children and that it has done so in good faith. Finally, Gerard contends that it has a duty to protect the confidentiality of patients' records.

Owing to a clerical error, the court was not promptly advised of IPAS's request for expedited relief or a preliminary injunction upon the filing of IPAS's initial or amended complaints. Nor did IPAS file a separate motion for a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure. Instead, following an inquiry from counsel for IPAS concerning the status of the case, the court set IPAS's request for a preliminary injunction, as embodied in IPAS's Amended Complaint, for hearing on June 6, 2001. Prior to the hearing, the parties did not submit any briefs or any documents in addition to those appended to their Complaints and Answers in support of or resistance to the request for a preliminary injunction.

At the hearing on June 6, 2001, plaintiff Iowa Protection and Advocacy Services, Inc., was represented by Sharon K. Malheiro of Davis, Brown, Koehn, Shors & Roberts, P.C., of Des Moines, Iowa. Defendant Gerard Treatment Programs, L.L.C., was represented by C. Bradley Price and Rustin Davenport of DeVries, Price & Davenport in Mason City, Iowa. During the hearing, the court granted IPAS's unopposed oral motion to amend its complaint to identify the defendant properly as Gerard Treatment Programs, L.L.C.

Also, during a conference in chambers prior to the preliminary injunction hearing

and during that hearing itself, the parties were able to narrow the principal issue the court must resolve at this time to the question of whether or not IPAS is entitled to access to records and patients, even where the patient's parent, guardian, or guardian ad litem has expressly withheld consent to such access. The parties identified four patients whose parents, guardians, or guardians ad litem had notified either IPAS or Gerard that they did not want IPAS to have access to the patient or the patient's records. The court granted the parties leave to submit letter briefs by e-mail on the specific question of IPAS's right of access in the face of a parent's or guardian's express refusal of consent. The court received such a letter brief from IPAS on June 13, 2001, and one from Gerard on June 19, 2001. With the filing of these letter briefs, the matter of IPAS's request for a preliminary injunction is fully submitted.

## II. LEGAL ANALYSIS

### A. Standards For A Preliminary Injunction

This court recently summarized the applicable considerations for issuance of a preliminary injunction as follows:

"The burden of establishing the propriety of a preliminary injunction is on the movant." *Baker Elec. Co-op., Inc. [v. Chaske]*, 28 F.3d [1466,] 1472 [(8th Cir. 1994)].

As the Eighth Circuit Court of Appeals recently explained,

The relevant factors on a motion for a preliminary injunction are: "(1) the probability of success on the merits; (2) the threat of irreparable harm to the movant; (3) the balance between this harm and the injury that granting the injunction will inflict on other interested parties; and (4) whether the issuance of an injunction. is in the public interest." *Sanborn Mfg. Co.,*

*Inc. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 485–86 (8th Cir.1993) (citing *Dataphase Sys., Inc. v. C.L. Sys., Inc.*, 640 F.2d 109, 114 (8th Cir.1981) (en banc)). "A district court has broad discretion when ruling on requests for preliminary injunctions, and we will reverse only for clearly erroneous factual determinations, an error of law, or an abuse of that discretion." *United Indust. Corp. v. Clorox Co.*, 140 F.3d 1175, 1179 (8th Cir.1998)(citation omitted.) *Entergy, Ark., Inc. v. Nebraska*, 210 F.3d 887, 898 (8th Cir.2000); *Bandag, Inc. v. Jack's Tire & Oil, Inc.*, 190 F.3d 924, 926 (8th Cir.1999); *Iowa Right to Life Committee, Inc. v. Williams*, 187 F.3d 963, 966 (8th Cir.1999). In accordance with the usual practice in this circuit, this court will refer to these "relevant factors" as the *"Dataphase* factors." *See, e.g., Entergy, Ark., Inc.*, 210 F.3d at 893. As the Eighth Circuit Court of Appeals has also explained,

These factors are not a rigid formula. However, "[t]he basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506–07, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959). Thus, to warrant a preliminary injunction, the moving party must demonstrate a sufficient threat of irreparable harm. *See Adam–Mellang v. Apartment Search, Inc.*, 96 F.3d 297, 299 (8th Cir.1996).

*Bandag, Inc.*, 190 F.3d at 926; *Baker Elec. Co-op., Inc.*, 28 F.3d at 1472 ("No single factor in itself is dispositive; in each case all of the factors must be considered to determine whether on balance, they weigh towards granting the injunction. However, a party moving for a preliminary injunction is required to show the threat of irreparable

harm.") (internal quotation marks and citations omitted). *Branstad v. Glickman,* 118 F.Supp.2d 925, 937–38 (N.D.Iowa 2000). The court will consider the record in light of each of the "*Dataphase* factors" in turn below.

### B. Consideration Of The Relevant Factors

#### 1. Likelihood of success on the merits

As this court explained in *Branstad*, " '[A]djudication of a motion for a preliminary injunction is not a decision on the merits of the underlying case.' " *Branstad,* 118 F.Supp.2d at 939 (quoting *Hubbard Feeds v. Animal Feed Supplement, Inc.,* 182 F.3d 598, 603 (8th Cir. 1999)). Rather, " '[l]ikelihood of success on the merits requires that the movant find support for its position in governing law. In order to weigh in the movant's favor, the movant's success on the merits must be at least sufficiently likely to support the kind of relief it requests.' " *Id.* (quoting *Curtis 1000, Inc. v. Youngblade,* 878 F.Supp. 1224, 1247 (N.D.Iowa 1995) (internal editorial marks and citations omitted)). Thus, in this case, IPAS's "likelihood of success on the merits" requires a determination, in the first instance, of whether IPAS has the right under the PAMII Act or the DDA to interview patients and review their records notwithstanding that the patients' parents or guardians have expressly denied consent to such access.

#### a. Rights of access under the DDA and the PAMII Act

**i. Genesis of the P & A system.** The protection and advocacy system for developmentally disabled and mentally ill persons had the following genesis:

Disturbed by the inhumane and despicable conditions discovered at New York's Willowbrook State School for persons with developmental disabilities, Congress enacted the Developmental Disabilities Assistance and Bill of Rights Act ("the Act") to protect the human and civil rights of this vulnerable population. 42 U.S.C. §§ 6000 et seq. Pursuant to the Act, a state cannot receive federal funds for services to persons with developmental disabilities unless it has established a protection and advocacy ("P & A") system. 42 U.S.C. § 6042(a)(1).

Indeed, the Act does not merely require that the state have an advocacy system, but specifically declares: "In order for a State to receive an allotment under Subchapter II of this chapter—(1) the State must have in effect a system to protect and advocate the rights of persons with developmental disabilities." 42 U.S.C. § 6042(a). Thus, P & As are empowered, among other things, to: (1) investigate incidents of abuse and neglect of persons with developmental disabilities; (2) pursue legal, administrative, and other appropriate remedies on behalf of such persons to ensure the enforcement of their constitutional and statutory rights; and (3) provide information and referrals relating to programs and services addressing the needs of these persons. 42 U.S.C. § 6042(a)(2)(A) and (B).

*Alabama Disabilities Advocacy Prog. v. J.S. Tarwater Dev. Ctr.,* 97 F.3d 492, 494–95 (11th Cir.1996).

Similarly, as the Third Circuit Court of Appeals recently explained, "Congress found that funding was needed for [independent advocacy] organizations, because the mentally ill were vulnerable to abuse, injury, and neglect and because the states' response to these problems was often inadequate." *Pennsylvania Protection & Advocacy, Inc. v. Houstoun,* 228 F.3d 423, 425 (3d Cir.2000) (citing 42 U.S.C. § 10801(a)); *accord Doe v. Stincer,* 175 F.3d 879, 883 (11th Cir.1999); *Wisconsin*

*Coalition for Advocacy, Inc. v. Czaplewski,* 131 F.Supp.2d 1039, 1045 (E.D.Wis.2001); *Advocacy Ctr. v. Stalder,* 128 F.Supp.2d at 358, 360 (M.D.La.1999). Consequently, the PAMII Act, originally passed in 1986, "provides funding for the states to establish independent organizations (referred to in the Act as 'eligible systems') that monitor and protect the rights of the mentally ill." *Id.* (citing 42 U.S.C. § 10803). "These organizations are intended to 'investigate incidents of abuse and neglect of individuals with mental illness' and to take appropriate action to 'protect and advocate the rights of such individuals.' " *Id.* (quoting 42 U.S.C. § 10801(b)). *See generally Czaplewski,* 131 F.Supp.2d at 1045 (discussing the reasons for enactment of the DDA and subsequent extension of its protections to persons with mental illnesses under the PAMII Act); *Arizona Ctr. for Disability Law v. Allen,* 197 F.R.D. 689, 692 (D.Ariz.2000) (same); *Michigan Protection & Advocacy Serv., Inc. v. Miller,* 849 F.Supp. 1202, 1206–07 (W.D.Mich. 1994) (same). In this case, IPAS contends that residents of Gerard fall within the protections of both the DDA and the PAMII Act, as they may be either "developmentally disabled" or "mentally ill," or both. Gerard does not contest the generally applicability of the DDA and the PAMII Act to the issues involved in IPAS's access to Gerard's Mason City facility.

*ii. Authority of P & As.* Pursuant to § 6042 of the DDA, a designated advocacy organization, usually called a "P & A" in judicial decisions and administrative regulations, has "the authority to investigate incidents of abuse and neglect of individuals with developmental disabilities if the incidents are reported to the system or if there is probable cause to believe that the incidents occurred." 42 U.S.C. § 6042(A)(2)(B); *see also Mississippi Protection & Advocacy Sys., Inc. v. Cotten,* 929 F.2d 1054, 1058 n. 4 (5th Cir.1991) ("[The state P & A] also serves an impor-

tant investigatory function in its advocacy role.") (citing 42 U.S.C. § 6042(a)(2)(B)). Similarly, section 10805 of the PAMII Act grants a P & A substantial investigative authority. In pertinent part, § 10805 provides that "[a] system established in a State under section 10803 of this title to protect and advocate the rights of individuals with mental illness shall ... have the authority to ... investigate incidents of abuse and neglect of individuals with mental illness if the incidents are reported to the system or if there is probable cause to believe that the incidents occurred[.]" 42 U.S.C. § 10805(a)(1)(A); *see also Houstoun,* 228 F.3d at 426; *Stincer,* 175 F.3d at 883; *Czaplewski,* 131 F.Supp.2d at 1045; *Allen,* 197 F.R.D. at 692; *Stalder,* 128 F.Supp.2d at 360. For example, "[w]hen an individual with disabilities has died while receiving state services, a P & A has authority to access all records when the P & A determines probable cause exists." *Allen,* 197 F.R.D. at 693 (citing 42 U.S.C. §§ 6042(a)(2)(I)(ii) & 10805(a)(4)(B)).

The Eleventh Circuit Court of Appeals has concluded that nothing in the PAMII Act requires a P & A to name a specific individual in bringing suit to redress violations of the rights of individuals with mental illnesses; rather, "[t]he text of PAMII grants standing to protection and advocacy systems to pursue legal remedies to 'ensure protection of individuals with mental illness.' " *Stincer,* 175 F.3d at 884 (quoting 42 U.S.C. § 10805(a)(1)(B)); *and compare Pennsylvania Protection & Advocacy, Inc. v. Houston,* 136 F.Supp.2d 353, 364–67 (E.D.Pa.2001) (discussing representational or associational standing of a P & A). However, the P & A's claim for access cannot involve "merely an abstract or hypothetical dispute," but instead must instead involve a showing of some injury that is not too speculative to create a substantial justiciable controversy. *Georgia Advocacy Office, Inc. v. Camp,* 172

F.3d 1294, 1298–99 (11th Cir.1999). Nevertheless, the United States District Court for the District of Arizona recently concluded that the advocacy organization itself is the "final arbiter" of when "probable cause" exists for its investigation under either the DDA or the PAMII Act and "[n]either the P & A laws nor the regulations promulgated thereunder contemplate that the state or a service provider will reevaluate the P & A's determination of probable cause and deny access to the P & A because the state or service provider disagrees that probable cause exists." *Allen,* 197 F.R.D. at 693 (but concluding that there were genuine issues of material fact as to whether or not the service provider allowed "prompt" access to the records sought by the P & A, as required by the PAMII Act, and whether the timeliness for further disclosure demanded by the P & A in that case were reasonable).

The PAMII Act provides for access by a P & A to the records and facilities of publicly and privately run institutions, because "there is nothing in the language of the [PAMII Act] which would suggest that a private entity could not be sued to enforce that law's provisions." *Czaplewski,* 131 F.Supp.2d at 1049. "Indeed, a cursory review of 42 U.S.C. § 10802 would reveal that Congress fully intended *any* facility, whether it be publicly or privately owned, to be subject to the provisions of the [PAMII Act]." *Id.* at 1050 (noting, *inter alia,* the definition of "abuse" in 42 U.S.C. § 10802(1) and the definition of "facilities" in 42 U.S.C. § 10802(3)).

***iii. Rights of access.*** "To insure the investigatory role of the system, the Congress provided that the [P & A] 'shall have access to all records of any individual who is a client of the system if such individual, or the legal guardian, conservator, or other legal guardian, has authorized the system to have such access.'" *Stalder,* 128 F.Supp.2d at 361 (quoting § 10805(a)(4));

*accord Oklahoma Disability Law Ctr., Inc. v. Dillon Family & Youth Servs., Inc.,* 879 F.Supp. 1110, 1112 (N.D.Okla.1995) ("As one district court has written, 'Access to patient records is necessary for [a P & A] to serve its clients, evaluate it clients' concerns, and determine whether a client has a legal claim.'") (quoting *Robbins v. Budke,* 739 F.Supp. 1479, 1488 (D.N.M.1990)). Such access must also be granted when a complaint is received and must be extended promptly to all authorized agents of a P & A. *Id.* (citing § 10805(a)(4)(C) and *Robbins v. Budke,* 739 F.Supp. 1479 (D.N.M. 1990)). Thus, the "system," that is, the P & A,

shall—

 ***

(3) have access to facilities in the State providing care or treatment; [and]

(4) in accordance with section 10806 of this title, have access to all records of—

(A) any individual who is a client of the system if such individual, or the legal guardian, conservator, or other legal representative of such individual, has authorized the system to have such access;

(B) any individual (including an individual who has died or whose whereabouts are unknown)—

(i) who by reason of the mental or physical condition of such individual is unable to authorize the system to have such access;

(ii) who does not have a legal guardian, conservator, or other legal representative, or for whom the legal guardian is the State; and

(iii) with respect to whom a complaint has been received by the system or with respect to whom as a result of monitoring or other activities (either of which result from a com-

plaint or other evidence) there is probable cause to believe that such individual has been subject to abuse or neglect; and

(C) any individual with a mental illness, who has a legal guardian, conservator, or other legal representative, with respect to whom a complaint has been received by the system or with respect to whom there is probable cause to believe the health or safety of the individual is in serious and immediate jeopardy, whenever—

(i) such representative has been contacted by such system upon receipt of the name and address of such representative;

(ii) such system has offered assistance to such representative to resolve the situation; and

(iii) such representative has failed or refused to act on behalf of the individual[.]

42 U.S.C. § 10805(a)(3) & (4); *see also Camp,* 172 F.3d at 1297.

In *Houstoun,* the Third Circuit Court of Appeals concluded that the definition of "records" in § 10806 was applicable to the term as used in § 10805. *See Houstoun,* 228 F.3d at 426 & n. 1. Therefore, for purposes of these provisions of the PAMII Act,

[T]he term "records" includes reports prepared by any staff of a facility rendering care and treatment or reports prepared by an agency charged with investigating reports of incidents of abuse, neglect, and injury occurring at such facility that describe incidents of abuse, neglect, and injury occurring at such facility and the steps taken to investigate such incidents, and discharge planning records.

42 U.S.C. § 10806(b)(3)(A); *see also Houstoun,* 228 F.3d at 426–27 (holding that the plain language of this definition encompasses peer review reports, over the defendant's objections that peer review reports are not "incident reports," and holding further that peer review reports are records "of any individual," even though they "belong" to the hospital, because "of" is used in the sense of connection or association, not merely ownership). Moreover, the Third Circuit Court of Appeals concluded that the access to records provided by the PAMII Act preempts state law providing greater restrictions on access and that federal regulations attempting to avoid such preemption did not represent a reasonable interpretation of the statute by an administrative agency, and hence were rejected. *See Houstoun,* 228 F.3d at 427; *Czaplewski,* 131 F.Supp.2d at 1048 ("[B]y virtue of the express terms of 42 U.S.C. § 10805(a)(4), the agency/system *has* been given the authority to have access to such records, regardless of what authority it has been given by the [state] statutes.") (emphasis in the original). Stated baldly, "PAMII preempts any state law that gives a healthcare facility the right to withhold such records." *Id.* at 428; *Czaplewski,* 131 F.Supp.2d at 1048 ("[I]f there is a conflict between the federal statutes and the state statute with respect to the agency/system's authority to have access to the records of an individual with developmental disabilities or mental illness, it is the federal statutes which control. To hold otherwise would fly in the face of the Supremacy Clause of the Constitution.").

Finally, because "PAMII imposes a duty of confidentiality on the advocacy organizations themselves" in § 10806(a), disclosure of records to a P & A is not precluded by state confidentiality laws. *Id.* at 428–29; *Dillon Family & Youth Servs., Inc.,* 879 F.Supp. at 1112 (the access provisions of the PAMII Act preempt state law, and at the same time, the confidentiality provisions of the PAMII Act serve similar interests stated in state confidentiality laws). Indeed, the "access to records" provision

of the PAMII Act in § 10806 begins with the requirement that "an eligible system ... maintain the confidentiality of such records *to the same extent as is required of the provider of such services.*" 42 U.S.C. § 10806(a) (emphasis added); *Allen,* 197 F.R.D. at 692 ("A P & A must maintain the confidentiality of the records to the same extent as the provider of services.") (citing 42 U.S.C. § 10806(a)). Section 10806 also provides detailed restrictions on when and how information garnered in the course of a P & A's investigation may be disclosed to the individual who is the subject of the records or that individual's guardians. 42 U.S.C. § 10806(b). Only after detailing the requirements for confidentiality and restrictions on disclosure does the statute provide for access to "records," and only subject to those requirements and restrictions. *See* 42 U.S.C. § 10806(b)(3)(B) ("An eligible system shall have access to the type of records described in subparagraph (A) in accordance with the provisions of subsection (a) of this section [concerning confidentiality] and paragraphs (1) and (2) of subsection (b) of this section [concerning disclosure].").

A P & A's rights of access are further defined by regulations. *See, e.g., Camp,* 172 F.3d at 1298 & n. 2 (citing 42 C.F.R. § 51.42). Thus, 42 C.F.R. § 51.41 further defines a P & A's right of access to records, including further identification of what constitutes "records" within the scope of the PAMII Act, *see* 42 C.F.R. § 51.41(a) ("Access to records shall be extended promptly to all authorized agents of a P & A system."), (b) (identifying individuals whose records the P & A may access), & (c) (defining pertinent "records"), and 45 C.F.R. § 1386.22(a)–(c) states nearly identical regulations with regard to individuals with developmental disabilities under the DDA. Another regulation, 42 U.S.C. § 51.42, further defines a P & A's right of access to facilities and residents under the PAMII Act, *see* 42 U.S.C.

§ 51.42, while 45 C.F.R. § 1386.22(f)–(i) provides similar regulations regarding individuals with developmental disabilities under the DDA.

### b. Likelihood of success here

■ The principal question now presented on IPAS's request for a preliminary injunction in this case is whether IPAS has sufficient likelihood of success on the merits of its contention that it is entitled to access to patients and records of Gerard, even where the parents, guardians, or guardians ad litem have told either IPAS or Gerard that they do not want IPAS to have such access. It is the court's understanding from the representations of the parties that, in general, the parents or guardians have declined to give their consent primarily because they believe that the children for whom they are responsible have already provided any useful information to other investigative and law enforcement authorities and that further access by IPAS will only produce unnecessary additional disturbance or trauma to their children.

*i. The Riel decision.* This court is not the first to consider the narrow question of whether a P & A can obtain access to records and patients even where parents or guardians of the patients do not consent to such access. Rather, Judge Saris of the United States District Court of the District of Massachusetts recently considered this question under the DDA in *Disability Law Center, Inc. v. Riel,* 130 F.Supp.2d 294 (D.Mass.2001). In *Riel,* the guardian of one of the residents of a facility also declined consent to access by a P & A, for reasons similar to those identified by the parties in this case: she believed that staff at the facility had handled the incident in the best way, considering her daughter's condition and behavior; previous investigation by other authorities had been ade-

quate; further investigation would be disturbing and harmful to her child; and she did not wish for her child to become a "client" of the P & A. *Riel,* 130 F.Supp.2d at 296.

The court in *Riel* considered that "[t]he crux of this dispute is the interpretation of § 6042(a)(2)(I)(iii), giving the P & A access to 'all' records, when the P & A has received a complaint, or has probable cause, with respect to an individual with a legal guardian; the P & A has contacted the guardian and offered assistance; and the guardian has 'failed or refused to act on behalf of the individual.'" *Id.* at 297 (quoting § 6042(a)(2)(I)(iii)). The court summarized the arguments of the parties concerning this statutory provision as follows:

> The Commissioner asserts that the provision bars him from disclosing the records of a resident of a mental health facility against the wishes of a legal guardian who has made an informed decision to decline the P & A system's offer of services and assistance. He further contends that the phrase "failed or refused to act on behalf of the individual" is intended to address only those situations where an individual's appointed guardian has neglected her obligation as a guardian and failed to act in good faith. The DLC responds that it has statutory authority to obtain access to Loretta Riel's records without her guardian's consent even when the guardian acts in good faith, because it cannot fulfill its statutory mandate to investigate incidents of abuse and neglect, and to pursue appropriate legal remedies, without having access to the investigation reports and without reviewing the adequacy of the remedies provided.

*Riel,* 130 F.Supp.2d at 297–98.

In addressing these arguments, the court in *Riel* first noted that applicable case law was sparse. *Id.* at 298. The court found that no appellate court had addressed directly the question raised, although such courts had noted the importance of access to fulfillment of a P & A's investigatory role. *Id.* (citing *J.S. Tarwater Dev. Ctr.,* 97 F.3d at 497; *Cotten,* 929 F.2d at 1058–59). The court found that two federal district courts had confronted the issue more directly: The court in *Pennsylvania Protection & Advocacy, Inc. v. Royer-Greaves School for Blind,* 1999 WL 179797 (E.D.Pa.1999), had held that "'a guardian would not have the authority to deny access to the records of an individual for whom this section is satisfied, as this section is designed to give the P & A a right to access in the event a guardian is not responsive or cooperative,'" *Riel,* 130 F.Supp.2d at 298 (quoting *Royer-Greaves,* 1999 WL 179797 at *8), and the court in *Michigan Protection & Advocacy Service, Inc. v. Miller,* 849 F.Supp. 1202 (W.D.Mich.1994), held "that the [DDA] does not require parental consent to access records and that the Act 'clearly mandate[s] that [P & As] have the authority to access ... records in specific cases where developmentally disabled and mentally ill individuals are involved.'" *Riel,* 130 F.Supp.2d at 298 (quoting *Miller,* 849 F.Supp. at 1208).

Embarking on its own analysis of the question, the court in *Riel* began with the rules of statutory construction, which require the court to give effect to all words used in the statute in such a way that none are rendered meaningless, redundant, or superfluous. *Id.* at 299. Thus,

> Reading the statute as a whole, the Court is persuaded by the argument that where there is a complaint or probable cause, § 6042(a)(2)(I)(iii) gives the P & A the right to access those records necessary to "pursue legal, administrative and other appropriate remedies or approaches to ensure the protection of, and advocacy for" individuals with devel-

opmental disabilities and "to investigate incidents of abuse and neglect of individual with developmental disabilities" even where the guardian does not give her consent. § 6042(a)(2)(A)(i) & (a)(2)(B). These complementary statutory duties to investigate and pursue legal remedies are not contingent on a guardian's consent. Therefore, a construction of § 6042(a)(2)(1)(iii) permitting the guardian to block all access to records necessary to investigate an incident would effectively give the guardian veto power over the investigation itself, which would thwart the express statutory mandate of the P & A system.

*Riel*, 130 F.Supp.2d at 299. The court then rejected the defendant's argument that giving a P & A access to a patient and the patient's records regardless of a guardian's good faith objection would "reduce to a useless formality the requirement that the P & A system contact the legal guardian and offer assistance," and that, if this were a proper interpretation, why the trigger for access wasn't simply the filing of a complaint or the existence of probable cause. *Id.* While noting that this was a "fair argument," not least because of requirements under the DDA, for example, in 42 U.S.C. § 6000(c)(3), that the P & A respect the role of the legal guardian and family, the court observed that "the [DDA] does not recognize guardians as the *sole* decision-makers." *Id.* (emphasis in the original). Rather, the court found that the Senate Report from the 1990 amendments to the DDA, which first included the "fail[s] or refuse[s] to act" provision in 42 U.S.C. § 6042(a)(2)(A)(iii), showed that the amendment was intended to clarify that a guardian does not have the power to block a P & A's access to an individual's records. *Id.* at 299–300 (citing S.Rep. No. 101–376, at 12 & 33 (1990)). Thus, the court in *Riel* concluded that "the legislative history supports the statutory interpretation that Congress intended to let the P & A's obli-

gations trump the guardian's wishes in the 'extraordinary circumstances' outlined in the statute." *Id.* at 300. The court also rejected the defendant's argument that a "proactive" and "good faith" decision not to permit access was not a "fail[ure] or refus[al] to act," and thus did not fall within the "extraordinary circumstances" defined by the statute for a P & A to have access in the absence of a guardian's consent. *Id.* The court declined to "read a subjective good faith component into the statute," however tempting such a deferential approach might be, particularly under state law regarding guardianship, because "the rights of the P & A are governed by federal law, not state law, and Congress did not limit the words 'failed or refused to act' with any modifier like 'unreasonably,' 'in bad faith,' or 'in an abuse of trust.'" *Id.*

Therefore, the court concluded,

> In light of the unambiguous mandate to the P & A to investigate incidents of abuse and pursue appropriate remedies, the Court concludes that the better interpretation of § 6042(a)(2)(I)(iii) is that the P & A is entitled to obtain access to the records necessary for investigation so long as the other statutory prerequisites are met, regardless of the wishes of the guardian.

*Riel*, 130 F.Supp.2d at 300–01.

In this case, the court embraces the analysis of the court in *Riel* with regard to the "access" provisions of the DDA, 42 U.S.C. § 6042, but notes further that the dispute in this case also centers on a P & A's rights of access under the PAMII Act, governed by 42 U.S.C. § 10805. Therefore, the court turns to that additional question next.

***ii. Effect of a guardian's denial of consent under the PAMII Act.*** A P & A's rights of access under the PAMII Act depend on interpretation of 42 U.S.C.

§ 10805(a)(4), which is comparable to the DDA provision at issue in *Riel.* Section 10805(a)(4) provides that the P & A shall "have access to all records of ... any individual with a mental illness, who has a legal guardian, conservator, or other legal representative, with respect to whom a complaint has been received by the system or with respect to whom there is probable cause to believe the health or safety of the individual is in serious and immediate jeopardy, whenever—(i) such representative has been contacted by such system upon receipt of the name and address of such representative; (ii) such system has offered assistance to such representative to resolve the situation; and (iii) *such representative has failed or refused to act on behalf of the individual.*" 42 U.S.C. § 10805(a)(4) (emphasis added). Not only is virtually identical statutory language at issue under the PAMII Act, but the arguments of the parties here are similar—indeed, nearly identical—to those presented in *Riel* with regard to the pertinent provision of the DDA. Gerard contends that a guardian's good faith refusal of consent is not the same as a "failure or refusal to act" on behalf of a patient, while IPAS contends that refusal of consent falls within the statutory language, thus permitting IPAS to obtain access even in the face of an express refusal of consent, and to read the statute otherwise would thwart its ability to fulfill its mandate to investigate situations involving probable cause to believe that abuse or neglect has occurred or may occur.

Like the court in *Riel,* this court begins its analysis of § 10805(a)(4) in light of the rules of statutory interpretation. This court has, on numerous occasions, pointed out that the first approach to statutory interpretation is the "plain language" of the statute in question. *See, e.g., United States v. Ochoa–Heredia,* 125 F.Supp.2d 892, 925 (N.D.Iowa 2001); *Rouse v. Iowa,* 110 F.Supp.2d 1117, 1124–25 (N.D.Iowa

2000); *Hoffman v. Cargill, Inc.,* 59 F.Supp.2d 861, 871 n. 6 (N.D.Iowa 1999), *rev'd on other grounds,* 236 F.3d 458 (8th Cir.2001); *Adler v. I & M Rail Link, L.L.C.,* 13 F.Supp.2d 912, 932 n. 10 (N.D.Iowa 1998); *Rural Water Sys. # 1 v. City of Sioux Center, Iowa,* 967 F.Supp. 1483, 1516 (N.D.Iowa 1997), *aff'd,* 202 F.3d 1035 (8th Cir.2000), *cert. denied,* 531 U.S. 820, 121 S.Ct. 61, 148 L.Ed.2d 28 (2000); *Sicard v. City of Sioux City, Iowa,* 950 F.Supp. 1420, 1436 n. 7 (N.D.Iowa 1996). The Supreme Court describes this rule as the "one, cardinal canon before all others." *Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 253, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992). "[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Id.* (citing *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 241–42, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989); *United States v. Goldenberg,* 168 U.S. 95, 102–03, 18 S.Ct. 3, 42 L.Ed. 394 (1897); *Oneale v. Thornton,* 10 U.S.(6 Cranch) 53, 68, 3 L.Ed. 150 (1810)). When the language of the statute is plain, the inquiry also ends with the language of the statute, for in such instances "the sole function of the courts is to enforce [the statute] according to its terms." *Ron Pair,* 489 U.S. at 241, 109 S.Ct. 1026 (quoting *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917)). This "plain language" or "plain meaning" rule of interpretation is not limited to the meaning of individual terms; rather, "[s]uch an inquiry requires examining the text of the statute as a whole by considering its context, 'object, and policy.'" *Harmon Indus., Inc. v. Browner,* 191 F.3d 894, 899 (8th Cir.1999) (quoting *Pelofsky v. Wallace,* 102 F.3d 350, 353 (8th Cir.1996)). Thus, this court must "effectuate the intent reflected in the language of the enactment and the legislative process," *Colorado v. Idarado Mining Co.,* 916 F.2d 1486, 1494 (10th

Cir.1990), *cert. denied,* 499 U.S. 960, 111 S.Ct. 1584, 113 L.Ed.2d 648 (1991), and it is not required to "produce a result demonstrably at odds with the intentions of [the statute's] drafters." *Ron Pair Enters., Inc.,* 489 U.S. at 242, 109 S.Ct. 1026 (internal quotation marks omitted). Therefore, this court must look for Congress's intent in both the language of the statute and its legislative history.

The "plain meaning" of § 10805(a)(4) is that it grants the P & A what might be described as "overriding" authority to obtain access to patients and their records, notwithstanding a guardian's "refusal or failure to act on behalf of the individual" upon the request of the P & A for permission for such access. *See* 42 U.S.C. § 10805(a)(4) (granting a P & A access where a patient's "representative has been contacted by such system upon receipt of the name and address of such representative; (ii) such system has offered assistance to such representative to resolve the situation; and (iii) *such representative has failed or refused to act on behalf of the individual"*) (emphasis added). Looking at the statutory context of this language, as explained above, the purpose of access by a P & A to records and patients is precisely for the purpose of "acting on behalf of the individual" residents of facilities by investigating actual or potential abuse or neglect. *See Stalder,* 128 F.Supp.2d at 361 ("To insure the investigatory role of the system, the Congress provided that the [P & A] 'shall have access to all records of any individual who is a client of the system if such individual, or the legal guardian, conservator, or other legal guardian, has authorized the system to have such access.' ") (quoting § 10805(a)(4)); *Dillon Family & Youth Servs., Inc.,* 879 F.Supp. at 1112 ("As one district court has written, 'Access to patient records is necessary for [a P & A] to serve its clients, evaluate it clients' concerns, and determine whether a client has

a legal claim.' ") (quoting *Robbins,* 739 F.Supp. at 1488). Thus, the guardian's "fail[ure] or refus[al] to act on behalf of the individual," in the context of the statute, plainly includes the guardian's failure to consent to access by the P & A.

Moreover, such a reading of the statute is in keeping with the " 'object and policy' " of the PAMII Act, *see Harmon Indus., Inc.,* 191 F.3d at 899 (quoting *Pelofsky,* 102 F.3d at 353), and would best "effectuate the intent reflected in the language of the enactment and the legislative process." *Idarado Mining Co.,* 916 F.2d at 1494. Just as the "failed or refused to act" provision was added to the DDA by amendments in 1990, *see Riel,* 130 F.Supp.2d at 299 (citing S.Rep. No. 101–376 (1990) with regard to 42 U.S.C. § 6042(a)(2)(I)(iii)), the comparable provision was added to the pertinent provision of the PAMII Act, 42 U.S.C. § 10805(a)(4), by amendment in 1991. *See* S.Rep. No. 102–114, 102nd Cong., 1st Sess.1991, 1991 WL 142023 (regarding P.L. 102–173, the Protection and Advocacy for Mentally Ill Individuals Amendments Act of 1991). Specifically, the Committee Report states,

> This section is also amended by adding the following policy: [A P & A shall have access to all records of—] any individual with a mental illness, who has a legal guardian, conservator, or other legal representative, with respect to whom a complaint has been received by the system or with respect to whom there is probable cause to believe the health or safety of the individual is in serious and immediate jeopardy, whenever: (1) such representative has been contacted by such system upon receipt of the name and address of such representative, (2) such system has offered assistance to such representative to resolve the situation, and (3) such representative has failed or refused to act on behalf of the individual.

*This provision is identical to a provision added to the Developmental Disabilities Assistance Bill of Rights Act by Public Law No. 101–496.*

S.Rep. No. 102–114 § IV, 1991 WL 1402023 (emphasis added). As explained more fully in the legislative history of the cross-referenced amendment to the DDA,

> Another issue raised was with regard to the difficulty experienced by some systems in reaching clients for whom the system has reason to believe that abuse or neglect may be occurring and that the health and safety of the individual is in serious jeopardy. In cases where the individual has a guardian, existing law requires that the P & A System not become involved if the guardian refuses the assistance offered. Clarification of the conditions under which the P & A System can intervene in these extraordinary circumstances is necessary.

S.Rep. No. 101–376, at 12 (1990); *see also Riel,* 130 F.Supp.2d at 299. As the court in *Riel* explained, "The Senate Report also pointed out that under then-current law, the P & A system could gain access to records only for incompetent persons who did not have legal guardians." *Riel,* 130 F.Supp.2d at 300 (citing S.Rep. No. 101–376 at 23). The Senate Report on the comparable amendment to the DDA continued,

> Section 13 amends Section 142 and clarifies the conditions under which protection and advocacy systems have access to records in those extraordinary situations when there is reason to believe that the health or safety of an individual with developmental disabilities is in serious or immediate jeopardy and the legal guardian, conservator, or other legal representatives have been in contact, offered assistance, but have failed or refused to act on behalf of the person.

S.Rep. No. 101–376 at 33; *see also Riel,* 130 F.Supp.2d at 300. Because of the express incorporation of an identical provision into the PAMII Act, it follows that congressional intent supports the conclusion that § 10805(a)(4) of the PAMII Act was also intended to permit a P & A to obtain access, even if the guardian refuses the assistance offered by the P & A. *Cf. Riel,* 130 F.Supp.2d at 300.

The court finds equally persuasive here, with regard to the PAMII Act, the observation of the court in *Riel* that, in amending the DDA, "Congress did not limit the words 'failed or refused to act' with any modifier like 'unreasonably,' 'in bad faith,' or 'in an abuse of trust.' " *See id.* Thus, this court cannot find that, however reasonable or in good faith the guardian's objections to access by the P & A may be, Congress intended guardians to have "veto" power over a P & A's access under the PAMII Act. This reading is further confirmed by the fact that *the same amendment* to the PAMII Act that introduced the provision clarifying that the P & A is entitled to access where a guardian has "failed or refused to act" *also* amended the PAMII Act *to place greater emphasis on the role of family members and guardians:*

> Section 3 of the bill amends the findings section of the PAMII Act (section 101) [42 U.S.C. § 10801] by stating that family members of individuals with mental illness play a crucial role in being advocates for the rights of individuals with mental illness where the individuals are minors, the individuals are legally competent and choose to involve the family members, and the individuals are legally incompetent and the legal guardians, conservators, or other legal representatives are members of the family.
>
> The committee believes that the involvement of family members is crucial to the successful implementation of the PAMII Act and therefore family involve-

ment should be welcomed and encouraged. The committee also recognizes that family members frequently assume significant responsibility for overseeing the care and treatment of family members with mental illness. Where a person with mental illness is a client of the P & A system, the committee believes that P & A staff should involve family members where the family member with a mental illness is: a minor, legally competent and chooses to involve the family members, and legally incompetent and the legal guardians, conservators, or other legal representatives are members of the family. Of course the nature of the involvement must be consistent with State law (including Canons of Professional Responsibility) and other Federal laws.

S.Rep. No. 102–114 § IV, 1991 WL 142023. Thus, the recognition in the PAMII Act of the importance of the role of family and guardians, emphasized at the same time Congress provided P & As with "overriding" authority to access records and patients, does not undermine the conclusion that the PAMII Act permits a P & A to override the wishes of a parent or guardian and obtain access to a patient or the patient's records, even where a parent or guardian specifically refuses to consent to such access by the P & A.

Reading the plain language of § 10805(a)(4) of the PAMII Act in the context of the statute and its legislative history, the court concludes that this provision, like the comparable provision of the DDA, 42 U.S.C. § 6042(a)(2)(I)(iii), provides that a P & A, such as IPAS, is entitled to obtain access to the records and patients necessary for its investigation, so long as other statutory prerequisites are met, regardless of the wishes of the guardian. *Cf. Riel,* 130 F.Supp.2d at 301 (so holding with regard to § 6042(a)(2)(I)(iii) of the DDA). At the very least, IPAS has sufficient likelihood of success on the mer-

its of its claim of a right of access, even in the face of express denial of consent to such access by a guardian, for the court to conclude that IPAS has carried its burden on the first of the *"Dataphase* factors" as to its authority to access records and patients where consent of parents or guardians is not forthcoming. *Branstad,* 118 F.Supp.2d at 939 (the first of the *"Dataphase* factors," "likelihood of success on the merits," "requires that the movant find support for its position in governing law" and that "the movant's success on the merits must be at least sufficiently likely to support the kind of relief it requests.") (internal editorial marks, quotation marks, and citations omitted).

***iii. Other limitations.*** In its letter brief, e-mailed to the court on June 19, 2001, Gerard presented little or no resistance to IPAS's contention that it is entitled to access even where parents or guardians have refused to give IPAS consent for such access. Instead, Gerard reverted to some of the issues raised in its Answer to IPAS's Amended Complaints. One of these issues is Gerard's contention that IPAS is not entitled to access until IPAS provides Gerard with information that IPAS has satisfied the conditions set forth in the applicable statutes and regulations, that is, information that IPAS has made a good faith attempt to contact patients' representatives, has offered its assistance, and the representatives have failed or refused to act. Gerard also resurrects the issues of whether IPAS will permit parents or guardians to be present during interviews with residents; whether IPAS is entitled to the "blanket" access it requests, or only to access to records and patients where it can show that there is probable cause to believe that *those specific patients* are in immediate jeopardy of abuse or neglect; and the extent to which IPAS's access may be subject to reasonable time and manner restrictions, includ-

ing requirements that IPAS's activities be carried out in a manner consistent with the principle that families and their guardians should be the primary decisionmakers. The court will also consider these contentions as part of its "success on the merits" analysis.

The court agrees with Gerard that, based on the plain language of both applicable statutes, 42 U.S.C. § 6042(a)(2)(I) and 42 U.S.C. § 10805(a)(4)(C), and applicable regulations, 45 C.F.R. § 1386.22(a)(3) and 42 C.F.R. § 51.41(b)(3), a P & A's "overriding" authority to obtain access to records, even where guardians of those patients object to such access, is not "triggered" until three requirements have been met: (1) the P & A has contacted or made a good faith effort to contact the patient's representative; (2) the P & A has offered assistance; and (3) the patient's representative has "failed or refused to act on behalf of the individual." Furthermore, it is not unreasonable for Gerard (or the court) to demand some demonstration that these requirements have been satisfied before Gerard is compelled to provide access to records. However, to avoid unnecessary delay or interference with Gerard's investigatory obligations, such a demonstration of compliance must not impose any unreasonable burdens. Therefore, the court concludes that IPAS must do no more than provide Gerard with notice of the date on which IPAS contacted or attempted to contact a patient's representative with an offer of assistance and request for consent to access; whether or not the representative responded to the contact by a deadline reasonable under the circumstances that is set forth in IPAS's request for consent and offer of assistance; and whether, if a response was received, the representative gave consent to IPAS's access or expressly declined to give such consent. As the foregoing discussion demonstrates, if the representative fails to respond to IPAS's request for consent and offer of assistance, or if the representative expressly declines to give such consent, IPAS shall nevertheless have access to the patient and records involved, on the ground that IPAS will have adequately demonstrated that the representative "fail[ed] or refus[ed] to act." 42 U.S.C. §§ 6042(a)(2)(I) & 10805(a)(4)(C).

As to Gerard's contention that parents, guardians, or legal representatives must be allowed to be present during any interviews by IPAS, the court agrees that IPAS did represent during the hearing on its request for a preliminary injunction that, to the extent possible, the presence of such representatives would be permitted during interviews of patients. However, the court does not agree with Gerard to the extent that Gerard argues that 42 C.F.R. § 51.42(c) necessarily grants representatives a right to prevent, be present at, or to terminate such interviews.

The part of 42 C.F.R. § 51.42(c) on which Gerard appears to rely provides that

a P & A system shall have *reasonable unaccompanied access* to ... residents at reasonable times, which at a minimum shall include normal working hours and visiting hours. Residents include adults or minors who have legal guardians or conservators. P & A activities shall be conducted so as to minimize interference with facility programs, respect residents' privacy interests, *and honor a resident's request to terminate an interview.*

42 C.F.R. § 51.42(c) (emphasis added). First, the regulation says nothing whatever about a *representative's* right to terminate an interview; rather, the regulation requires a P & A to "honor a *resident's* request to terminate an interview." *Id.* (emphasis added). The regulation is cast only in terms of a *resident's* right to terminate an interview, even though the regulation otherwise contemplates that "[r]esi-

dents include adults and minors who have legal guardians or conservators." *Id.* Had it been the intent of the agency to confer upon the representative the right to terminate an interview, it would have been a simple matter to state the right to terminate in terms of "a resident or a resident's parent, guardian, or legal representative." The court declines to read language into the regulation that is not present. *Cf. Germain,* 503 U.S. at 253, 112 S.Ct. 1146 ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there.") (citing *Ron Pair Enters., Inc.,* 489 U.S. at 241–42, 109 S.Ct. 1026).

Perhaps more importantly, the applicability of paragraph (c) of the regulation is even more limited than Gerard suggests, because Gerard fails to distinguish between the "investigative" functions of a P & A, which IPAS contends are the primary functions at issue here, and "monitoring" and other functions. The paragraph of the regulation pertaining to access for "investigative" purposes, paragraph (b), instead states the following:

(b) ... *The P & A system shall have reasonable unaccompanied access to residents at all times necessary to conduct a full investigation of an incident of abuse or neglect. This authority shall include the opportunity to interview any facility service recipient, employee, or other person, including the person thought to be the victim of such abuse,* who might be reasonably believed by the system to have knowledge of the incident under investigation. Such access shall be afforded, upon request, by the P & A system when:

(1) An incident is reported or a complaint is made to the P & A system;

(2) The P & A system determines there is probable cause to believe that an incident has or may have occurred; or

(3) The P & A system determines that there is or may be imminent danger of serious abuse or neglect of an individual with mental illness.

42 C.F.R. § 51.42(b) (emphasis added). This provision, it will be noted, says nothing about a resident's or a legal representative's right to prevent, be present during, or terminate an interview conducted under the P & A's investigative authority. Paragraph (c) on which Gerard relies, on the other hand, provides for access *"[i]n addition to access as prescribed in paragraph (b) of this section"* and the "additional" access permitted under paragraph (c) is

for the purpose of:

(1) Providing information and training on, and referral to programs addressing the needs of individuals with mental illness, and information and training about individual rights and the protection and advocacy services available from the P & A system, including the name, address, and telephone number of the P & A system.

(2) Monitoring compliance with respect to the rights and safety of residents; and

(3) Inspecting, viewing and photographing all areas of the facility which are used by residents or are accessible to residents.

42 C.F.R. § 51.42(c) (emphasis added). Although IPAS asserted at the hearing that it was seeking such "monitoring" access as well, its primary contention was that it was seeking access for "investigative" purposes. Thus, paragraph (b) of the regulation is controlling as to IPAS's access for such "investigative" purposes.

Moreover, both paragraph (b) and paragraph (c) refer to a P & A's right to "reasonable *unaccompanied* access." *See* 42 C.F.R. § 51.42(b) & (c). Paragraph (d) of the regulation specifically defines "un-

accompanied access to residents" as "includ[ing] the opportunity to meet and communicate *privately* with individuals regularly, both formally and informally, by telephone, mail and in person," and again specifies that "[r]esidents include minors or adults who have legal guardians or conservators." 42 C.F.R. § 51.42(d) (emphasis added). Thus, the statute cannot be construed to *require* the presence of a patient's legal representative or a representative of the facility. If anything, the regulation permits P & A agents to interview residents "privately" and "unaccompanied" by such other persons. Also, nothing in either paragraph (b) or paragraph (c) permits a legal representative to prevent an interview by P & A agents, either in pursuit of an "investigation," *see* § 51.42(b), or in pursuit of the P & A's functions of "providing information and training," "monitoring," or "inspecting." *See* § 51.42(c). For the same reason, Gerard's reliance on § 51.42(c) for the proposition that IPAS's "investigation must be done in a manner that prohibits an unreasonable interference with the operation of the Gerard program" is misplaced. *See* Defendant's June 19, 2001, Letter Brief at 3. The requirement that "P & A activities shall be conducted so as to minimize interference with facility programs" is also, and only, in the paragraph pertaining to the P & A's functions of "providing information and training," "monitoring," or "inspecting," *see* § 51.42(c), not in the paragraph pertaining to a P & A's investigative functions, § 51.42(b).

Although Gerard is correct that IPAS must "make every effort to insure that the parents of minors or guardians of individuals in the care of the facility are informed that the system will be monitoring activities at the facility and may in the course of such monitoring have access to the minor," Defendant's June 19, 2001, Letter Brief at 3, the paragraph of the regulation imposing this requirement, paragraph (e), again

specifically relates to "[t]he right of access specified in paragraph (c) of this section," that is, it relates to access in the course of "monitoring" functions, not to "investigative" functions described in paragraph (b). *See* § 51.42(e). Similarly, while Gerard is correct that paragraph (e) supports Gerard's contention that IPAS cannot take formal action on behalf of individuals with legal guardians or conservators, or initiate a formal attorney/client or advocate/client relationship without appropriate consent, except in "emergency situations," the "emergency situations" referred to in paragraph (e) of the regulation are those "described in § 51.42(b)(3)," *see* § 51.42(e), which again are investigations by a P & A based on the P & A system's "determin[ation] that there is or may be imminent danger of serious abuse or neglect of an individual with mental illness." *See* § 51.42(b)(3). Again, IPAS has determined that such imminent danger exists in this case, thus falling within the exception articulated in paragraph (e).

This is not to suggest that IPAS should take a "high-handed" approach to excluding parents or legal guardians from interviews or from the decisionmaking process concerning whether interviews of specific residents are necessary. IPAS is encouraged to involve parents and guardians in these parts of its investigation in furtherance of the interest in family involvement articulated, for example, in the 1991 amendments to the PAMII Act, *see* S.Rep. No. 102–114 § IV, 1991 WL 142023 (regarding amendments to 42 U.S.C. § 10801 amplifying the "findings" section of the statute to emphasize the "crucial role" of family members as advocates for mentally ill persons) and 42 C.F.R. § 51.42. Moreover, access throughout the regulations is modified by the term "reasonable." As the court suggested in *Pennsylvania Protection & Advocacy, Inc. v. Royer–Greaves School for the Blind,* 1999 WL 179797

(E.D.Pa.1999), "reasonable access includes general facility access without notice, and patient access with twenty-four hour notice." *Royer–Greaves*, 1999 WL 179797 at *6. The court will incorporate these "reasonableness" limitations on access into any preliminary injunction requiring Gerard to provide access to residents. Nevertheless, the court concludes that the regulation on which Gerard relies does not give a patient's legal representative a right to prevent, be present during, or to terminate an interview.

Therefore, the court turns to Gerard's contention that IPAS has made only a "generalized" determination of probable cause, not a probable cause determination as to specified individuals. Gerard contends that, as explained in the *Royer–Greaves* decision, such a "generalized" determination does not provide IPAS with authority to access the records of all of the residents of Gerard. Rather, Gerard contends that, to overcome the objections of parents and legal representatives to IPAS's access, IPAS must show something more, such as serious and immediate jeopardy to the specific resident for whom that parent or legal representative is responsible.

In *Royer–Greaves*, the court wrote,

It is evident from the structure of § 6042(a)(2)–I(iii) that this section is designed to give a P & A access to records where they have received a complaint and/or have probable cause regarding an individual, and the guardian has been contacted by the P & A and does not grant permission or refuses to act. The language of this section of the Act is clear, and it contemplates access to records when the [P & A] either receives a complaint regarding an individual resident, or has probable cause to believe that the health or safety of an individual is in serious and immediate jeopardy. Further, the reliance by the court in

[*Alabama Disabilities Advocacy Prog. v. J.S. Tarwater Dev. Ctr.*, 97 F.3d 492 (11th Cir.1996),] on the specific wrongdoing alleged with respect to two individuals who died at while in [sic] residence in a facility supports defendant's position, although it does not affirmatively state that the complaint or probable cause determination must be made regarding an individual for record access. None of the evidence submitted by the plaintiff even suggests that they received a complaint regarding an individual or had probable cause to believe that the health and safety of any individual resident was in jeopardy, but instead merely suggests that there were complaints or that [the P & A] had probable cause to believe that there were unsafe conditions at [the defendant institution], conditions for which they are obligated to visit the premises to investigate. Should their investigations lead them to believe that an individual resident is in jeopardy, at that time they have the right to request to see the records of that individual. Based on the foregoing, [the P & A] has not established an entitlement to the records of any students, and the Court will deny their motion and grant summary judgment in favor of the defendant.

*Royer–Greaves*, 1999 WL 179797 at *8. However, the court also identified a caveat to its conclusion that generalized probable cause determinations will not support general access to records:

This ruling today should not be read to hold that there are no circumstances under which a P & A could have a more generalized access to records. For example, the Court can envision a situation where a P & A receives complaints of serious widespread abuse against numerous residents, or has probable cause to suspect that the health and safety of numerous residents is in serious and

immediate jeopardy. Should such a situation present itself, it could warrant a P & A to have a more generalized access to all of the records to properly investigate.

*Royer–Greaves,* 1999 WL 179797 at *8 n. 11.

■ Although, in *Royer–Greaves,* the court concluded that "even accepting as true all of the hearsay allegations contained in plaintiff's affidavits, their allegations do not even begin to approach such a situation," *id.,* this court notes that IPAS has alleged that it has received information sufficient to provide it with probable cause to believe that the health and safety of *all* of the residents of the Gerard facility is in serious and immediate jeopardy and that IPAS so notified Gerard, thus falling within the exceptional circumstances contemplated in footnote 11 of the decision in *Royer–Greaves. See* Amended Complaint, ¶¶ 20, 21 & 24. Although the precise nature of the generalized threat to all residents is not expressly stated in IPAS's Amended Complaint, it appears to be the alleged general misuse of restraints that led to the death of Tanner Wilson. Unlike the *Royer–Greaves* case, which was before the court on a summary judgment record, the present case is before the court on little more than the pleadings and a request for a preliminary injunction. Thus, IPAS's allegations are enough to establish some likelihood that governing law will permit the access it seeks. *See Branstad v. Glickman,* 118 F.Supp.2d 925, 939 (N.D.Iowa 2000) (the first of the "*Dataphase* factors," "likelihood of success on the merits," "requires that the movant find support for its position in governing law" and that "the movant's success on the mer-

its must be at least sufficiently likely to support the kind of relief it requests.") (internal editorial marks, quotation marks, and citations omitted). Gerard has not asserted that no probable cause at all exists in this case, only that IPAS's assertion of probable cause is too generalized to support the access to records that IPAS seeks.[1] In these circumstances, the court concludes that IPAS's allegations are sufficient to support the preliminary injunctive relief it seeks.

Thus, IPAS has satisfied the first of the "*Dataphase* factors" pertinent to the determination of whether or not it is entitled to the preliminary injunctive relief it seeks.

#### 2. *Irreparable harm*

■ The court therefore turns to the second of the "*Dataphase* factors," the question of whether IPAS has shown "irreparable harm." As this court explained in *Branstad,* "The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies. Thus, to warrant a preliminary injunction, the moving party must demonstrate a sufficient threat of irreparable harm." *Branstad,* 118 F.Supp.2d at 941 (internal quotation marks and citations omitted). The court is not without guidance from other courts on this factor in the analysis.

The United States District Court for the Eastern District of Wisconsin recently held on this factor in the preliminary injunction analysis, in a case by a P & A seeking injunctive relief to obtain access to records under the PAMII Act, that the plaintiff P & A had satisfied this require-

---

1. Although IPAS may be the "final arbiter" of whether or not probable cause exists, and consequently, Gerard may not refuse access on the ground that no probable cause has been shown, *see Allen,* 197 F.R.D. at 693, the court does not believe that Gerard is barred from seeking judicial review of the sufficiency of IPAS's probable cause for its expanded investigation. *See Royer–Greaves,* 1999 WL 179797 at *8 & n. 11.

ment, notwithstanding the defendant's contention that the allegations of abuse and neglect concerning two residents had been thoroughly investigated by other agencies and that the P & A's investigation would likewise reveal, if it had not already, that the deaths of the two residents were not the result of abuse or neglect. *Wisconsin Coalition for Advocacy, Inc. v. Czaplewski,* 131 F.Supp.2d 1039, 1051 (E.D.Wis.2001). The court rejected the defendant's arguments, because the court concluded "that the defendant's refusal to provide [the plaintiff P & A] with records that it is entitled to review (indeed, charged to review as a part of its responsibilities) does, in a very real and readily identifiable way, pose a threat to the [P & A's] being able to discharge its obligations [a]nd no amount of damages will remedy that sustained harm." *Id.* On the basis of such a showing of irreparable harm, that court found that the plaintiff P & A had satisfied this prong of the preliminary injunction test. *Id.* Similarly, in *Advocacy Center v. Stalder,* 128 F.Supp.2d 358 (M.D.La.1999), the district court concluded that a *permanent* injunction was warranted, where the plaintiff P & A had demonstrated that there is no adequate legal remedy available other than injunctive relief and the danger of future violations of the PAMII Act's access requirements was "certainly cognizable," in light of the failure of a temporary restraining order to curtail the defendant's policy of refusing to allow access on the authority of state law and the defendant's policies. *Stalder,* 128 F.Supp.2d at 368. The court concluded that the P & A should not be required to relitigate its rights of access over any bar established by state law or the defendant's policies every time the P & A sought access to the defendant's records. *Id.* On the other hand, the district court in *Oklahoma Disability Law Center, Inc. v. Dillon Family & Youth Services, Inc.,* 879 F.Supp. 1110 (N.D.Okla. 1995), concluded that the plaintiff P & A

had made insufficient showing that future violations were likely to occur to justify permanent injunctive relief concerning future conduct, despite the defendant's "consistent reluctance" to turn over the records of two patients concerning whom an investigation was in progress, although the court granted the requested injunctive relief with regard to the two patients already under investigation. *See Dillon Family & Youth Servs., Inc.,* 879 F.Supp. at 1112.

■ In this case, the court concludes, first, that Gerard has refused to allow IPAS access to patients and their records where the guardians of those patients have informed Gerard or IPAS that they do not want IPAS to have such access. Whether or not other investigations have already been conducted of alleged abuse and neglect at Gerard, and whether or not any investigation already undertaken by IPAS or likely to be undertaken by IPAS has or will reveal that no abuse or neglect has occurred at Gerard, IPAS is still irreparably harmed by being prevented from pursuing fully its right to access records and patients, even where the guardians do not consent, in pursuit of its duty to investigate circumstances providing probable cause to believe abuse or neglect may be occurring. *See Czaplewski,* 131 F.Supp.2d at 1051. That harm cannot be fully remedied by damages. *See id.; Stalder,* 128 F.Supp.2d at 368. Nor should IPAS be required to relitigate its right of access over a guardian's objections each time a guardian objects. *See Stalder,* 128 F.Supp.2d at 368. Although the court in *Dillon Family & Youth Servs., Inc.,* 879 F.Supp. at 1112, declined to provide *permanent* injunctive relief beyond access to two residents of the defendant as to whom an investigation was already in progress, because the possibility of future violations of the P & A's rights of access was too speculative, here, what is at issues is

whether the threat of irreparable harm to IPAS's *present* investigations is sufficient to warrant *preliminary* injunctive relief. Under the circumstances, IPAS has made a sufficient showing on this second *"Dataphase* factor" to justify preliminary injunctive relief.

### 3. Balance of harms and public interest

■ Next, the court must consider "the balance between the harm to the movant and the injury that the injunction's issuance would inflict on other interested parties and the public interest." *Branstad,* 118 F.Supp.2d at 942 (internal quotation marks, editorial marks, and citations omitted). On this prong of the preliminary injunction analysis in a case involving access under the PAMII Act, the district court in *Czaplewski* concluded that the defendant institutions' concerns about disciplinary or regulatory consequences for disclosure of records did not weigh against issuance of a preliminary injunction for the very simple reason that the injunction itself would shield the defendants from such consequences, noting, "[a]fter all, the defendants could hardly be punished for complying with a federal court order." *Czaplewski,* 131 F.Supp.2d at 1052. Moreover, the court rejected the defendants' concerns about the privacy interests of its patients as weighing against issuance of a preliminary injunction, because the P & A had a *right* of access to the records in question by virtue of the PAMII Act, for the following reasons:

> As long as the [P & A's] actions are in accord and consistent with its duties and responsibilities under the [DDA] and the [PAMII Act], it is to have access to such records. Moreover, that it will have access to such records would not, in any event, unduly intrude upon the privacy of nursing home residents. This is because federal law requires that [the P & A] keep such records confidential. *See*

42 C.F.R. § 51.45; 45 C.F.R. § 1386.22(e). *Pennsylvania Protection & Advocacy, Inc. v. Houstoun,* 228 F.3d 423, 428–29 (3rd Cir.2000).

*Czaplewski,* 131 F.Supp.2d at 1052; *Stalder,* 128 F.Supp.2d at 366 (also concluding that "the confidentiality of the records would not be affected by releasing the records because the [P & A] has obtained the consent of the inmates. Additionally, under the PAMII Act, a protection and advocacy system must maintain the confidentiality of the records to the same extent as the provider of the service. There is no reason to suspect that the confidentiality of the records will be breached.") (citing 42 U.S.C. § 10806(a)). Similarly, in *Stalder,* the district court concluded that "[i]ssuance of a permanent injunction in this case does not subject the defendants to a penalty or a hardship since it requires them to do exactly what the act requires, i.e., to comply with the law." *Stalder,* 128 F.Supp.2d at 368.

The Eleventh Circuit Court of Appeals also discussed a similar balance of interests in a DDA case when a P & A makes a probable cause determination:

> In the P & A probable cause process, the interests of three parties are implicated—those of the facility, those of the individual who may have been subject to abuse and his or her family; and those of the P & A, which has an obligation and mandate to protect from abuse the individual(s) and others who are similarly situated. In this balance, the facility's interests surely are less viable and of less import than those of the individual and the P & A. The facility can claim no interest in avoiding investigations of harm or injury to a person with a disability. Minor inconveniences to staff or some disruption of the facility's routine hardly rise to the level of the liberty interest that is generally at issue in a

criminal investigation. *Michigan Protection & Advocacy Service, Inc. v. Miller,* 849 F.Supp. 1202, 1208–09 (W.D.Mich.1994) (defendants' objections that the P & A access to facility for children will interfere with programming have no merit). Indeed, one would suppose that a facility's legitimate interests are served when abuse and neglect are uncovered and can be corrected. Likewise, when a P & A makes a finding of probable cause, no liberty interest of the developmentally disabled person is threatened, as it is precisely that individual's interest that the P & A seeks to protect. *See United States v. Allis–Chalmers,* 498 F.Supp. 1027, 1031 (E.D.Wis. 1980) (occupational safety agency may have access to employees' health records since agency "is acting on behalf of the very employees" the company claims it is seeking to protect by alleging that access violated employees' privacy).

*J.S. Tarwater Dev. Ctr.,* 97 F.3d at 499.

Similarly here, the court concludes that the interests of Gerard in forestalling an investigation border on the nonexistent. *See id.* Moreover, Gerard's interest in barring access to records and patients where the guardian objects is significantly diminished by the fact that Gerard would be permitting access where federal law, as interpreted above, and any order of this court granting a preliminary injunction require it to provide such access. *See Czaplewski,* 131 F.Supp.2d at 1052; *Stalder,* 128 F.Supp.2d at 368. Nor can Gerard realistically argue that an interest in maintaining confidentiality of the records outweighs permitting IPAS to have the access it seeks, even where a guardian objects, because IPAS must maintain the confidentiality of any records to the same extent

Gerard itself must. *See id.; Stalder,* 128 F.Supp.2d at 366. From consideration of fact patterns in other cases and common sense, the court recognizes that there may be interests of the patients themselves that might be contrary to a preliminary injunction permitting IPAS access even where a guardian objects;[2] however, no such interests have yet been articulated in this case that would outweigh the interest in issuance of a preliminary injunction, not least, because it is precisely the liberty interests of the patients that IPAS is seeking to protect. *See J.S. Tarwater Dev. Ctr.,* 97 F.3d at 499. Finally, the weight of the objecting guardians' interest in not permitting IPAS such access has already been considered by Congress in enacting the amendments to the DDA and the PA-MII Act that permit a P & A like IPAS to have such access even where a guardian objects. Thus, the public interest, as weighed by Congress, weighs in favor of injunctive relief permitting IPAS to obtain access to patients and their records even where guardians of the patients object to such access.

All of the *"Dataphase* factors" thus weigh in favor of granting a preliminary injunction permitting IPAS access to patients and records even where guardians of patients do not consent. Moreover, as alleged, this is the kind of case in which probable cause exists as to the potential for serious abuse of all of the residents of Gerard, thus justifying IPAS's request for access to all such residents and their records.

## C. Bond

Although neither of the parties made any mention of the requirement of

---

2. Indeed, it is in part because the court recognizes that such interests may exist that the court will stay issuance of a preliminary injunction in this case to allow parents, guardians, or other legal representatives to intervene to assert such interests on motions to reconsider whether the preliminary injunction should indeed issue.

security for issuance of a preliminary injunction, found in Rule 65(c) of the Federal Rules of Civil Procedure, the court cannot ignore the requirements of the Rule. Rule 65(c) provides, in pertinent part, as follows:

> (c) Security. No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained. No such security shall be required of the United States or of an officer or agency thereof.

FED.R.CIV.P. 65(c). As this court explained in *Branstad,* "The bond posed under Rule 65(c) is a security device, not a limit on the damages the [defendant] may obtain against the [plaintiff] if the facts warrant such an award." *Branstad,* 118 F.Supp.2d at 944 (internal quotation marks, editorial marks, and citations omitted). Although IPAS is not "the United States or . . . an officer or agency thereof," and thus appears to be subject to the bond requirement, *see* FED.R.CIV.P. 65(d), in the absence of a dictate from the Eighth Circuit Court of Appeals that a bond is mandatory,[3] the court feels justified in waiving the bond requirement in this case, where neither party raised the issue, it is unclear what "security" Gerard would require against improvident issuance of the preliminary injunction, and the plaintiff is a non-profit advocacy organization created by the state under federal law. No security shall be required for issuance of the preliminary injunction in this case.

## III. CONCLUSION

On the principal question that remained unresolved after the hearing on IPAS's request for a preliminary injunction, the court concludes that IPAS should be granted a preliminary injunction requiring Gerard to permit IPAS to have access to patients and their records, even where the guardians of those patients have expressly stated that they do not want IPAS to have such access. IPAS has demonstrated sufficient likelihood of success on the merits of its claim that governing law permits it such access, even over objections of guardians. On subsidiary questions reintroduced in Gerard's post-hearing letter brief, the court concludes that IPAS must provide Gerard with notice, as specified above, that IPAS has satisfied the requirements for access to records and patients notwithstanding objections by guardians. The court also concludes that IPAS has sufficiently alleged probable cause exists as to the potential for serious abuse of all of the residents of Gerard to justify IPAS's request for access to all such residents and their records. IPAS should nevertheless exercise its rights of access, to the extent possible, in a manner that permits parents and legal guardians to be involved in the determination of what access to patients and records is required to complete IPAS's

---

**3.** In *Rathmann–Group v. Tanenbaum,* 889 F.2d 787 (8th Cir.1989), the appellate court determined that the district court abused its discretion by not requiring a bond in addition to the $10,000 already posted on the issuance and continuation of a TRO, which can be read to mean that the bond for a preliminary injunction was mandatory even where a previous bond for a TRO was in place. *Id.* at 789. However, the court cited as support for its decision to remand, *Roth v. Bank of the Com-*
*monwealth,* 583 F.2d 527, 539 (6th Cir.1978), which found error, according to the *Rathmann–Group* court, "not because [the] trial court failed to require a bond in any particular amount, but because [the] court failed to exercise discretion required by Rule 65(c) by expressly considering [the] question of requiring [a] bond," *id.,* which suggests that whether or not a bond is required is in the discretion of the court.

"death" and "probable cause" investigations and that permits parents and legal representatives to be present during interviews. In monitoring facilities and programs at Gerard, IPAS must seek access in a "reasonable" manner, and should also conduct its activities in a manner that minimizes interference with Gerard's programs.

As to other *"Dataphase* factors," the court concludes that IPAS will suffer irreparable harm not fully compensable by damages if it is prevented from pursuing its statutory duty to investigate circumstances providing probable cause to believe that abuse or neglect may have or may be occurring at Gerard's facility in Mason City, and the balance of harms weighs in favor of the preliminary injunctive relief requested. Therefore, the *"Dataphase* factors" being satisfied, the court will grant IPAS's request for a preliminary injunction, as that request was narrowed at the hearing.

However, because the court is, to some extent, adjudicating the rights of parties not present before the court, specifically, any guardians objecting to access by IPAS, the court will stay its preliminary injunction order for thirty days to permit those parties to intervene in this action and to move the court to reconsider its conclusion that IPAS has overriding authority to obtain access to records and patients over objections of guardians.

THEREFORE,

1. IPAS's request for a preliminary injunction is **granted** to the extent explained herein.

2. **The attached preliminary injunction shall issue on July 25, 2001,** without bond, unless stayed or rescinded prior to that time by order of this court.

3. Parents or guardians of residents of Gerard who do not consent to access by IPAS shall have **to and including July 13,** 2001, to move the court for leave to intervene in this action for the purpose of moving the court to reconsider its conclusions herein. **Not later than July 2, 2001,** the parties shall jointly provide notice of this ruling to the parents, guardians, or guardians ad litem of residents at the Gerard facility in Mason City, Iowa, who either (a) have expressly stated to either IPAS or Gerard that they do not want IPAS to have access to the resident for whom they are responsible or that resident's records; or (b) have not yet responded to IPAS's request for consent for IPAS to obtain access to a resident or a resident's records.

**IT IS SO ORDERED.**

### PRELIMINARY INJUNCTION

**WHEREAS,** this matter came before the court on the April 2, 2001, request by plaintiff Iowa Protection & Advocacy Services, Inc. (IPAS), for a preliminary injunction,

**AND WHEREAS,** pursuant to Rule 65 of the Federal Rules of Civil Procedure, the court finds that past and future interference by defendant Gerard Treatment Programs, L.L.C. (Gerard), with IPAS's access to residents, residents' records, and facilities at Gerard's facility in Mason City, Iowa, would impose irreparable harm or injury or the threat of such irreparable harm or injury upon IPAS's activities under the Protection and Advocacy for Mentally Ill Individuals Act of 1986, as amended in 1991 (PAMII Act), 42 U.S.C. § 10801 *et seq.,* and the "Protection and Advocacy of Individual Rights" provision of the Developmental Disabilities Act of 1984, as amended (DDA), 42 U.S.C. § 6042, and upon further consideration of all other relevant factors,

**DEFENDANT GERARD TREATMENT PROGRAM, L.L.C. (GERARD),** is hereby **preliminarily enjoined,** as follows:

1. Gerard is enjoined from preventing or interfering with access by IPAS to the residents, records of residents, and facilities of Gerard's institution in Mason City, Iowa.

2. Gerard shall provide IPAS with access to residents and records of residents at Gerard's facility in Mason City, Iowa, upon IPAS providing Gerard with notice of the following:

 a. the date on which IPAS contacted or attempted to contact a patient's representative with an offer of assistance and request for consent to access;

 b. whether or not the representative responded to the contact by a deadline set forth in IPAS's request for consent and offer of assistance; and

 c. whether, if a response was received, the representative gave consent to IPAS's access or expressly declined to give such consent.

Where these notice requirements are satisfied, Gerard shall provide access to residents and records of residents, even if objections are made by a resident's parent, guardian, guardian ad litem, or other legal representative.

3. Gerard shall provide IPAS with access to residents, records, and facilities of Gerard during normal business and visiting hours of Gerard. However, access during other times shall not be unreasonably withheld by Gerard.

 a. Gerard shall provide IPAS with access to records as promptly as circumstances reasonably permit upon presentation by IPAS of the notice of contact with a resident's guardian as prescribed in paragraph 2 above.

 b. Gerard shall provide IPAS with access to residents upon presentation of the notice of contact with a resident's guardian as prescribed in paragraph 2 above and upon twenty-four (24) hours notice to Gerard of a request by IPAS to interview a named resident.

To the extent possible, all activities by IPAS shall be conducted so as to minimize interference with Gerard's programs and any inconvenience or distress to residents.

This preliminary injunction shall be binding upon the parties to this action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of this order.

This preliminary injunction shall issue without the posting of any bond or security by plaintiff herein.

**IT IS SO ORDERED.**